UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALAN SEWARD,

                      Plaintiff,

      v.

DET. CAMILO R. ANTONINI, *et al.*,

                 Defendants.

No. 20-CV-9251 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Anand Swaminathan, Esq.
Heather L. Donnell, Esq.
Loevy & Loevy
Chicago, IL
*Counsel for Plaintiff*

Jarrett Adams, Esq.
Law Office Of Jarrett Adams, PLLC
New York, NY
*Counsel for Plaintiff*

Andrew C. Quinn, Esq.
Anthony J. DiFiore, Esq.
Lalit K. Loomba, Esq.
Marykate Acquisto, Esq.
Matthew K. Schieffer, Esq.
Steven J. Bushnell, Esq.
The Quinn Law Firm, PLLC
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff Alan Seward ("Plaintiff") brings this Action against Det. Camilo R. Antonini

("Antonini"), Det. Sgt. Sean J. Fegan ("Fegan"), P.O. Robert G. Puff ("Puff"), Sgt. Jose Quinoy

("Quinoy"), P.O. Ravin Palmer ("Palmer"), P.O. Joseph Valente ("Valente"; with the other

individual defendants, the "Officer Defendants"), and the City of Mount Vernon ("City"; collectively, "Defendants").[1]  (*See generally* First Am. Compl. ("FAC") (Dkt. No. 28).)  Plaintiff raises claims pursuant to 42 U.S.C. § 1983 and state law.  (*Id.*)[2]  Before the Court is Defendants' Motion for Partial Summary Judgment on several of Plaintiff's state and federal claims.  (Not. of Mot. (Dkt. No. 122).)[3]  For the reasons that follow, Defendants' Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, specifically:

- Defendants' 56.1 Statement, (Defs' Rule 56.1 Statement ("Defs' 56.1") (Dkt. No. 123));

- Plaintiff's Response to Defendants' 56.1 Statement, (Pl's Resp. to Defs' 56.1 Statement ("Pl's Resp. 56.1") (Dkt. No. 134));

---

[1] Plaintiff initially brought suit against several other Defendants, including Shawn Harris, Glenn Scott, Robert Kressman, Sebastian Salazar, Patrick King and Michael Hutchins, but the Parties stipulated to the dismissal of these Defendants with prejudice on September 28, 2022. (*See* Stipulation (Dkt. No. 120).)
Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper righthand corner of each page.

[2] Plaintiff also initially brought a federal fair trial claim, and state-law negligent hiring and training claims, but the Parties have stipulated to dismissal of those claims with prejudice. (*See* Stipulation.)  Moreover, Plaintiff has indicated in his opposition papers that he does not object to dismissal of his state and federal malicious prosecution claims, so the Court grants summary judgment to Defendants on these claims and will not otherwise address them.  (Pl's Mem. of Law in Opp'n to Mot. for Summ. J. ("Pl's Opp'n") 6 n.1 (Dkt. No. 132).)

[3] Defendants are not seeking summary judgment on Plaintiff's claims related to the alleged strip searches or Antonini's alleged use of excessive force.  (*See* Letter from Heather L. Donnell, Esq. to Court (Aug. 2, 2022) (Dkt. No. 118); Pl's Opp'n 6 n.1.)

- Plaintiff's Statement of Additional Facts, (Pl's Statement of Add'l Facts ("PSOAF")

  (Dkt. No. 133).)[4]

Additionally, where necessary, the Court cites directly to the admissible evidence submitted by

the Parties.  The facts as described below are in dispute to the extent indicated.

### 1.  Parties

Plaintiff is a lifelong resident of Mount Vernon, New York.  (Defs' 56.1 ¶ 1; Pl's Resp.

56.1 ¶ 1.)  When Plaintiff attended high school, he attended under the name "Alan Thompson."

(Defs' 56.1 ¶ 2; Pl's Resp. 56.1 ¶ 2.)  Plaintiff was arrested in Connecticut in 1996 and, at the

time, presented an identification card with the name "Alan Thompson" to the arresting officers.

(Defs' 56.1 ¶ 3; Pl's Resp. 56.1 ¶ 3.)  Plaintiff was imprisoned under the name "Alan

Thompson."  (Defs' 56.1 ¶ 4; Pl's Resp. 56.1 ¶ 4.)  Plaintiff is also known by the name "Budda

Bless."  (Defs' 56.1 ¶ 5; Pl's Resp. 56.1 ¶ 5.)

Antonini is a Detective in the Mount Vernon Police Department ("MVPD").  (Defs' 56.1

¶ 6; Pl's Resp. 56.1 ¶ 6.)

---

[4] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise
statement, in numbered paragraphs, of the material facts as to which the moving party contends
there is no genuine issue to be tried."  Local Civ. R. 56.1(a).  The nonmoving party, in turn, must
submit "a correspondingly numbered paragraph responding to each numbered paragraph in the
statement of the moving party, and if necessary, additional paragraphs containing a separate,
short[,] and concise statement of additional material facts as to which it is contended that there
exists a genuine issue to be tried."  *Id.* at 56.1(b).  "If the opposing party . . . fails to controvert a
fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to
the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation omitted); *see
also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (adopting the same rule).
    Because Defendants have not filed a response to Plaintiff's Statement of Additional
Facts, (*see generally* Dkt.), the Court deems those facts admitted and will rely on them as
relevant to deciding the instant Motion.  *See Polanco v. Porter*, No. 21-CV-10927, 2023 WL
2751340, at *2 n.3 (S.D.N.Y. Mar. 31, 2023) (deeming statement of additional facts admitted
where opposing party did not respond).  Defendants have contested some of these facts in their
Reply, so the Court will address those arguments as relevant.  (*See generally* Defs' Reply Mem.
of Law in Supp. of Mot. for Summ. J. ("Defs' Reply") (Dkt. No. 143).)

Fegan is a Detective Sergeant in the MVPD.  (Defs' 56.1 ¶ 7; Pl's Resp. 56.1 ¶ 7.)  At the time of the events at issue in this case, Fegan was the supervising officer of the MVPD Narcotics Unit.  (PSOAF ¶ 73.)

Puff is a Detective in the MVPD.  (Defs' 56.1 ¶ 8; Pl's Resp. 56.1 ¶ 8.)  Puff joined the Narcotics Unit in December 2015 and served in it until 2021.  (Decl. of Heather L. Donnell, Esq. ("Donnell Decl.") Ex. 14 at 40:22–41:8 (Dkt. No. 135-15).)

Quinoy was a Sergeant with the MVPD at the time of the events giving rise to this Action.  (Defs' 56.1 ¶ 9; Pl's Resp. 56.1 ¶ 9.)

Palmer was a Police Officer with the MVPD at the time of the events giving rise to this Action.  (Defs' 56.1 ¶ 10; Pl's Resp. 56.1 ¶ 10.)

Valente was also a Police Officer with the MVPD at the time of the events giving rise to this Action.  (Defs' 56.1 ¶ 11; Pl's Resp. 56.1 ¶ 11.)

The City is a municipal corporation organized and existing under the laws of New York.  (Defs' 56.1 ¶ 12; Pl's Resp. 56.1 ¶ 12.)

### 2.  November 2, 2017 Search Warrant

The apartment building located at 156 South 1st Avenue, in Mount Vernon, New York (the "Building") is a location where illegal narcotics have been used and sold.  (Defs' 56.1 ¶ 13; Pl's Resp. 56.1 ¶ 13.)[5]  The drug dealing activity in the Building took place in the stairwell of the building and outside of it.  (PSOAF ¶ 3.)  MVPD received a complaint from a resident of the Building.  (Defs' 56.1 ¶ 14; Pl's Resp. 56.1 ¶ 14.)  Puff was assigned to conduct an investigation

---

[5] Plaintiff objects to Defendants' characterization of the building as a location with "a relatively high rate of illegal narcotics activity," and the Court does not rely on that statement. (Pl's Resp. 56.1 ¶ 13.)

regarding the complaint, which included conducting surveillance outside of the Building and speaking with a confidential informant (the "CI").  (Defs' 56.1 ¶ 15; Pl's Resp. 56.1 ¶ 15.)

On November 2, 2017, Puff signed an affidavit in support of an application for a search warrant for Apartment 4N in the Building ("Apartment 4N") and "Budda Bless."  (Defs' 56.1 ¶¶ 16, 22; Pl's Resp. 56.1 ¶¶ 16, 22.)  Puff's affidavit stated that he received information on October 27, 2017 from the CI that a man with the street name "Budda Bless" was selling crack cocaine from Apartment 4N and that he had lived there with his wife, another woman, and three children for approximately a year.  (Defs' 56.1 ¶ 18; Pl's Resp. 56.1 ¶ 18; PSOAF ¶¶ 9–10.)[6] According to Puff's affidavit, the CI described "Budda Bless" as a Black male in his 40s-50s, with brown skin, of average height and weight, who was clean shaven with a bald head.  (Defs' 56.1 ¶ 19; Pl's Resp. 56.1 ¶ 19.)  Puff's affidavit stated that the CI had purchased crack cocaine from "Budda Bless" every day of the week prior to October 27, 2017.  (PSOAF ¶ 12.)  Puff also stated that the CI had completed a controlled purchase of cocaine from "Budda Bless" in Apartment 4N on October 28, 2017.  (Defs' 56.1 ¶ 20; Pl's Resp. 56.1 ¶ 20.)

At 4:21 PM on November 2, 2017, Mount Vernon City Judge Adrian Armstrong signed a search warrant order authorizing the search of Apartment 4N and search and seizure of

---

[6] Plaintiff states that he objects "to the extent that he [is] unable to admit or deny" this statement, but the Court finds that this is not a proper objection and deems the statement admitted.  *See Litchhult v. USTRIVE2, Inc.*, No. 10-CV-3311, 2013 WL 3491076, at *2 n.1 (E.D.N.Y. July 10, 2013) (deeming statements admitted where plaintiff stated that she could "neither admit or deny" defendant's statement).

With respect to the CI, Puff also stated in the affidavit that the CI had provided information in the past that had led to three arrests for various narcotics offenses.  (Defs' 56.1 ¶ 21; Pl's Resp. 56.1 ¶ 21.)

"Thompson, Alan D., aka 'Budda Bless,'" and any individuals on the premises at the time of the warrant's execution.  (Defs' 56.1 ¶¶ 23–25; Pl's 56.1 ¶¶ 23–25.)[7]

Plaintiff disputes the facts set forth in Puff's affidavit.  First, Plaintiff has testified that he did not live in Apartment 4N in October and November 2017, or for about a year prior.  (PSOAF ¶ 11.)[8]  Plaintiff has also testified that he did not sell drugs at any point in October 2017.  (PSOAF ¶ 5.)[9]  Additionally, Puff and the CI exchanged numerous text messages in October 2016, November 2016, and June 2017, but no text messages in October 2017.  (PSOAF ¶¶ 13–14.)  The MVPD Narcotics Unit has receipts for several payments to the CI for drug buys in 2016 and 2017, but has no receipt for any payment made for the CI's drug purchase from "Budda Bless" on October 28, 2017, which Puff mentioned in his affidavit.  (PSOAF ¶¶ 15–16.)  Finally, MVPD records show that on October 19, 2017 the MVPD Narcotics Unit, in cooperation with another law enforcement agency, conducted an undercover drug purchase from Alan Thompson, AKA "Budda Bless."  (Donnell Decl. Ex. 5 at 8 (Dkt. No. 135-5); *see also* PSOAF ¶ 4.)  The October 19 controlled purchase is not mentioned in Puff's November 2, 2017 affidavit.  (PSOAF ¶ 8.)

### 3.  November 7, 2017 Warrant Execution and Plaintiff's Arrest

On the evening of November 7, 2017, members of the MVPD Narcotics Unit, including, as relevant here, the Officer Defendants except Quinoy, executed the search warrant order for

---

[7] The search warrant order did not authorize Defendants to conduct a strip search of Plaintiff.  (Pl's Resp. 56.1 ¶¶ 24–25.)

[8] Plaintiff has also testified that he often visited and spent time in Apartment 4N.  (Defs' 56.1 ¶ 30: Pl's Resp. 56.1 ¶ 30.)

[9] Plaintiff had sold cocaine in the past and has been incarcerated for doing so, but he had not sold cocaine since his release from prison in 2013.  (PSOAF ¶ 6.)

Apartment 4N.  (Defs' 56.1 ¶¶ 26–27; Pl's Resp. 56.1 ¶¶ 26–27.)  When the Officer Defendants

first entered Apartment 4N, Kierra Thompson ("Thompson"), who leased the apartment, was

present, along with Sheila Blakely-Holly ("Blakely-Holly"), Shaniya Riddenhour, and several

minor children.  (Defs' 56.1 ¶¶ 28–29; Pl's Resp. 56.1 ¶¶ 28–29.)  Palmer testified that

Apartment 4N was "small."  (Donnell Decl. Ex. 4 at 50:10–15 (Dkt. No. 135-4).)

The Parties have provided a video created immediately prior to the search of Apartment

4N.  (*See generally* Donnell Decl. Ex. 51 (Dkt. No. 135-52).)  The Court notes that Apartment

4N was a railroad apartment; a person entering through the sole entry door stepped into the

kitchen.  (*Id.*)  Standing at the entry, a person could see through a doorless entry into a short

hallway that contained the door to the bathroom at the left and then beyond that to the living

room and, finally, the door to the bedroom.  (*Id.*)  If the bedroom door was open, a person

standing at the entry could partially see the contents of the bedroom.  (*Id.*)[10]

Blakely-Holly told the Officer Defendants that "Budda Bless" was at a local

establishment called the Bungalow Bar, which was at the time located at 523 South Fulton

Avenue in Mount Vernon.  (Defs' 56.1 ¶¶ 31–32; Pl's Resp. 56.1 ¶¶ 31–32.)[11]  Fegan and

Valente stayed at Apartment 4N.  (Defs' 56.1 ¶ 35; Pl's Resp. 56.1 ¶ 35.)  Quinoy and Puff went

to the Bungalow Bar to search for Plaintiff.  (Defs' 56.1 ¶ 34; Pl's Resp. 56.1 ¶ 34.)  The Parties

dispute whether Antonini also went to the Bungalow Bar.  (Defs' 56.1 ¶ 35; Pl's Resp. 56.1

¶ 35.)

---

[10] The converse is also true; Thompson testified in her deposition that "[m]y bedroom can
see down the hallway to the front door."  (Donnell Decl. Ex. 10 at 16:7–8 (Dkt. No. 135-11).)

[11] Plaintiff is familiar with the Bungalow Bar.  (Defs' 56.1 ¶ 33; Pl's Resp. 56.1 ¶ 33.)

The officers located Plaintiff at the Bungalow Bar and arrested him.  (Defs' 56.1 ¶¶ 36,

38; Pl's Resp. 56.1 ¶¶ 36, 38.)[12]  There is conflicting evidence concerning the circumstances

surrounding Plaintiff's arrest.  (Defs' 56.1 ¶¶ 36–37; Pl's Resp. 56.1 ¶¶ 36–37.)

- Puff testified that the officers located Plaintiff and that he then willingly handed over
  drugs from his breast pocket and told officers that any drugs located at Apartment 4N
  were also his.  (Decl. of Lalit K. Loomba ("Loomba Decl.") Ex. H at 18:10–22 (Dkt.
  No. 125-11).)

- Quinoy testified that officers immediately arrested Plaintiff once he was located and then
  patted him down for weapons and located narcotics in one of his pockets.  (Donnell Decl.
  Ex. 3 at 58:23–60:10.)

- Plaintiff testified that he initially attacked Antonini with a pool cue as Antonini
  approached him and then Antonini and other officers pulled out their badges to show they
  were police officers.  (Donnell Decl. Ex. 1 at 115:12–116:3; 121:2–5 (Dkt. No. 135-1).)
  Antonini asked Plaintiff who he was, told Plaintiff he was under arrest, handcuffed him,
  and showed him a blank piece of paper when Plaintiff asked why he was under arrest.
  (*Id.* at 116:4–14; 121:4–13.)  Antonini also asked Plaintiff whether he had any drugs,
  Plaintiff told him he had two bags of marijuana in the top pocket of his hoodie, and then
  Antonini removed the drugs from Plaintiff's pocket.  (*Id.* at 133:16–135:2.)

---

[12] Quinoy has testified that he was not present at Apartment 4N but received a call from
Fegan, who requested he go to the Bungalow Bar to assist in locating Plaintiff.  (Donnell Decl.
Ex. 3 at 56:14–57:5 (Dkt. No. 135-3).)  Quinoy has also testified that he was the supervising
officer at the Bungalow Bar.  (*Id.* at 60:19–61:2.)  The Court notes that Plaintiff has provided a
mini-transcript of Quinoy's deposition, so the Court cites to the page number in the upper right-
hand corner of each mini-transcript page.

The Parties also dispute what evidence was recovered from Plaintiff.  (Defs' 56.1 ¶ 36–37; Pl's Resp. 56.1 ¶ 36–37.)  The MVPD Incident Report states that officers recovered "5 plastic twist bags . . . and 12 ziplock bags of cocaine, weighing approx 10 grams" from a front pocket on Plaintiff's hoody.  (Loomba Decl. Ex. K at 3 (Dkt. No. 125-15).)  Plaintiff has testified that no cocaine was found on his person.  (*See* Donnell Decl. Ex. 1 at 133:16–135:2.)

Plaintiff has also testified that, after leaving the Bungalow Bar, Antonini strip searched him in the back of an unmarked car parked down the block.  (Defs' 56.1 ¶ 86; Pl's Resp. 56.1 ¶ 86.)  Plaintiff has testified that Antonini led him to the unmarked car alone.  (Defs' 56.1 ¶ 87; Pl's Resp. 56.1 ¶ 87.)  According to Plaintiff, at the time of the strip search, two arresting officers remained standing outside the Bungalow Bar, about 40–50 feet away, and three officers were in an unmarked car across the street.  (Defs' 56.1 ¶ 87; Pl's Resp. 56.1 ¶ 87.)[13]

The officers then returned to Apartment 4N with Plaintiff.  (Defs' 56.1 ¶ 40; Pl's Resp. 56.1 ¶ 40.)[14]  The officers searched Apartment 4N before Plaintiff was brought there.  (Defs' 56.1 ¶ 41; Pl's Resp. 56.1 ¶ 41; PSOAF ¶ 20.)[15]  During the search, officers recovered, among

---

[13] Quinoy has testified that he, along with four to six other officers, reported to the Bungalow Bar.  (Donnell Decl. Ex. 3 at 57:21–23.)

[14] The Parties dispute how long the officers were at the Bungalow Bar with Plaintiff.  (Defs' 56.1 ¶ 39; Pl's Resp. 56.1 ¶ 39.)  Defendants state that the officers were at the Bungalow Bar for three minutes, (Defs' 56.1 ¶ 39); Plaintiff states that the officers were at the Bungalow Bar for five minutes, (Pl's Resp. 56.1¶ 39).
Fegan has testified that he directed Puff to transport Plaintiff to Apartment 4N.  (PSOAF ¶ 75.)

[15] The Parties dispute which officer took the video.  (Defs' 56.1 ¶ 42; Pl's Resp. 56.1 ¶ 42.)  Defendants state that Antonini took the video.  (Defs' 56.1 ¶ 42.)  Plaintiff states that Valente took the video.  (Pl's Resp. 56.1 ¶ 42.)

other things, a plate with cocaine residue, a gray digital scale, two razor blades with cocaine residue, and assorted Ziplock bags.  (Defs' 56.1 ¶ 43; Pl's Resp. 56.1 ¶ 43.)[16]

Plaintiff has testified that Antonini strip searched him a second time in the bathroom of Apartment 4N.  (Defs' 56.1 ¶ 88; Pl's Resp. 56.1 ¶ 88.)[17]  According to Plaintiff, he was alone with Antonini and the door to the bathroom was closed during the search.  (Defs' 56.1 ¶ 89; Pl's Resp. 56.1 ¶ 89.)  Plaintiff testified that Palmer and a tall, slim Black officer were standing by the bathroom when Plaintiff was taken into it, (Donnell Decl. Ex. 1 at 144:10–13, 160:17–161:13), and, according to Plaintiff and Thompson, officers remained just on the other side of the bathroom door while Plaintiff was being searched, (*id.* at 160:17–161:13, 165:16–166:3; Donnell Decl. Ex. 10 at 51:18–52:23).  According to Plaintiff, after he had been searched and was shouting at Antonini, Antonini punched him in the face with no prior verbal warning or statement.  (Defs' 56.1 ¶ 90; Pl's Resp. 56.1 ¶ 90.)  Plaintiff also testified that the tall, slim Black

---

[16] Valente has testified that he participated in the search.  (Donnell Decl. Ex. 2 at 59:13–60:10 (Dkt. No. 135-2).)

Puff has also testified that he returned to Apartment 4N and was present for the search. (Donnell Decl. Ex. 14 at 166:5–20.)

Fegan has testified that he was present when Plaintiff was brought back to Apartment 4N. (PSOAF ¶ 75.)

Plaintiff's Statement of Additional Facts states, "Defendant Fegan further testified that he authorized all strip searches the Narcotics Unit conducted when he was present."  (*Id.* at ¶ 73.) However, the cited section of Fegan's deposition does not support that statement.  (*See* Donnell Decl. Ex. 21 at 58:12–59:16 (Dkt. No. 135-22).)

Plaintiff's Statement of Additional Facts also states that "Fegan testified that he authorizes all strip searches when present with the Narcotics Unit to execute a search warrant of a premises."  (PSOAF ¶ 75.)  However, the cited statement from Fegan's deposition, which was taken during discovery for *Rutherford v. City of Mt. Vernon*, No. 18-CV-10706, does not support that statement and, in fact, refers exclusively to events that occurred during the execution of an unrelated search on March 31, 2017.  (Donnell Decl. Ex. 50 at 79:23–80:2 (Dkt. No. 135-51).)

[17] Antonini has testified that Fegan was present for "pretty much every single one" of the strip searches Antonini had conducted and that he had never conducted a strip search without prior supervisor approval.  (PSOAF ¶ 74.)

officer was watching through the open bathroom door when Antonini punched him. (Donnell Decl. Ex. 1 at 174:22–175:25.)

According to Plaintiff, Antonini struck him a second time when he was alone with Antonini in a room at MVPD headquarters after Plaintiff had declined Antonini's request that he serve as a confidential informant. (Defs' 56.1 ¶ 91; Pl's Resp. 56.1 ¶ 91.)

Plaintiff suffered severe emotional distress as a result of the unlawful strip searches perpetrated by Defendants. (PSOAF ¶ 81.)

### 4. Subsequent Criminal Proceedings

On November 8, 2017, Puff signed a felony complaint (the "2017 Complaint") that charged Plaintiff with Criminal Possession of a Controlled Substance in the Third Degree, N.Y. Penal Law § 220.16. (Defs' 56.1 ¶ 44; Pl's Resp. 56.1 ¶ 44.) On April 24, 2018, Antonini signed a felony complaint ("the 2018 Complaint") charging Plaintiff with Criminal Sale of a Controlled Substance in the Third Degree, N.Y. Penal Law § 220.39, for the October 19, 2017 sale of two clear plastic knotted twists of crack cocaine to an undercover officer. (Defs' 56.1 ¶ 46; Pl's Resp. 56.1 ¶ 46.)

On December 13, 2017, Plaintiff appeared in Mount Vernon City Court on the 2017 Complaint and was released on his own recognizance on the condition that he return to court. (Defs' 56.1 ¶ 47; Pl's Resp. 56.1 ¶ 47.) On April 26, 2018, Plaintiff again appeared on the 2017 Complaint in Mount Vernon City Court. (Defs' 56.1 ¶ 48; Pl's Resp. 56.1 ¶ 48.) Plaintiff's appearance was adjourned from the morning to the afternoon session; Plaintiff learned during this time that he was going to be taken into custody for the 2018 Complaint and then intentionally fled to avoid being arrested. (Defs' 56.1 ¶ 48; Pl's Resp. 56.1 ¶ 48.) When Plaintiff failed to appear at a court hearing scheduled on May 9, 2017, a bench warrant was issued, and Plaintiff, who had failed to appear within 30 days of the issuance of the warrant, was

charged with Bail Jumping in the Second Degree, N.Y. Penal Law § 215.56.  (Defs' 56.1 ¶ 49; Pl's Resp. 56.1 ¶ 49.)

On January 21, 2020, Plaintiff pled guilty to a reduced charge of Bail Jumping in the Third Degree, N.Y. Penal Law § 215.55.  (Defs' 56.1 ¶ 50; Pl's Resp. 56.1 ¶ 50.)  Plaintiff's plea was also in satisfaction of the charges in the 2017 Complaint and the 2018 Complaint.  (Defs' 56.1 ¶ 51; Pl's Resp. 56.1 ¶ 51.)

### 5.  MVPD Policies and Procedures on Strip Searches

The MVPD adopted Operational Procedure 3.045 (the "Policy") on January 4, 1993, and the Policy remained in effect on November 7, 2017.  (Defs' 56.1 ¶ 52; Pl's Resp. 56.1 ¶ 52.)  In relevant part, the Policy provides that "a person will not be subject to a full strip search unless there is a rational basis for doing so."  (Defs' 56.1 ¶ 53; Pl's Resp. 56.1 ¶ 53.)  The Policy further states that a "strip search" should not be utilized unless "the arresting officer reasonably suspects that weapons, contraband[,] or evidence may be concealed upon the person or in their underclothing, in such a manner that they may not be discovered by . . . previous search methods."  (Defs' 56.1 ¶ 54; Pl's Resp. 56.1 ¶ 54.)  The Policy also lists facts that an officer should consider in determining whether a strip search should be conducted, including "the nature of the crime," the "arrest circumstances," the "subject's reputation," whether the arrest involved an "act of violence," and "discoveries from previous searches."  (Defs' 56.1 ¶ 55; Pl's Resp. 56.1 ¶ 55.)  The Policy provides that the "Desk Officer or supervisor present will decide if a strip search should be conducted and is responsible that the search is conducted properly."  (Loomba Decl. Ex. V at 3 (Dkt. No. 125-26).)  Finally, the Policy states that "[i]t should not be necessary to touch the subject's body, except for the examination of the hair."  (*Id.*)

The Policy refers to both "strip search[es]" and "body cavity search[es]" and provides that "[u]nder no condition shall a '[b]ody [c]avity [s]earch' be conducted by any Member of the

Department."  (Defs' 56.1 ¶ 56; Pl's Resp. 56.1 ¶ 56.)  The Policy further provides that a warrant

is generally required before a body cavity search may be conducted, and that a body cavity

search "must be conducted by a medical doctor."  (Defs' 56.1 ¶ 57; Pl's Resp. 56.1 ¶ 57.)

On February 10, 2015, the MVPD supplemented the Policy by issuing Detective Division

Supplemental Operational Procedure 16.00 (the "Supplemental Policy").  (Defs' 56.1 ¶ 58; Pl's

Resp. 56.1 ¶ 58.)[18]  The Supplemental Policy provides that strip searches are to be conducted in

accordance with the parameters set forth in the Policy.  (Defs' 56.1 ¶ 59; Pl's Resp. 56.1 ¶ 59.)

The Supplemental Policy also states with respect to "[s]earch[es] of [i]ndividuals in [c]ustody"

that are "conducted outside of the confines of the cellblock":

> In the event that a strip search is conducted[,] a Detective Division supervisor will
> be present and will direct one member to conduct the search in a private room.  A
> second member is to video/audio record the subject being advised that he/she will
> be strip searched.  The recording will continue from outside the private room while
> the searching officer and subject are inside.  Upon completion of the search, the
> recording officer will conclude the recording by asking the subject[']s name and
> inquiring of the searching officer and subject if the search was completed without
> incident and if any contraband was recovered.  This procedure will be followed in
> all instances in which a strip search is conducted regardless of location.

(Donnell Decl. Ex. 53 at 2 (Dkt. No. 135-54).)  The Supplemental Policy was adopted in

response to complaints MVPD had received concerning strip searches and was instituted to

create a more complete record of any future strip search so that complaints could be better

investigated and resolved.  (Defs' 56.1 ¶ 61; Pl's Resp. 56.1 ¶ 61.)

Puff testified in his deposition that while he was assigned to the Narcotics Unit, it was

standard practice during the execution of a search warrant to do a strip search of anyone present

at the premises where the warrant authorized a search of persons present on the premises because

---

[18] As the supervising officer of the Narcotics Unit, Fegan helped create the Supplemental
Policy.  (PSOAF ¶ 73.)

"during transport, somebody could dump something outside, or stash it in the car.  It's just easier if you just get the person ready to go into the jail cell, do the whole search there, make sure you can recover everything . . . then they can . . . be transported to headquarters."  (Donnell Decl. Ex. 14 at 72:3–73:13.)[19]  Fegan also testified: "[Strip searches] have been done at homes where there is a search warrant present that gives us the permission to search the people that are present on the premise[s] the search warrants [were] for."  (Donnell Decl. Ex. 21 at 54:15–20.)

### 6.  MVPD Training related to Strip Searches

The Defendant Officers' training records do not indicate that any strip search or body cavity search training was provided prior to the alleged unlawful strip searches of Plaintiff. (PSOAF ¶ 70.)  Puff testified that he did not recall receiving any training in strip searches at the police academy or from the City.  (PSOAF ¶ 71.)  Fegan and Antonini testified that they had no recollection of the City providing them any training on strip or body cavity searches.  (PSOAF ¶ 72.)

Valente testified that he had received no training on conducting strip searches but also stated that "you learn from . . . other officers, senior officers who . . . would be assigned to the [N]arcotics [U]nit."  (Donnell Decl. Ex. 2 at 42:3–11.)  Similarly, Fegan testified that after joining the MVPD, he did not receive any hands-on training because "[h]ands-on [training] was train as you go . . . as the situation arises."  (Donnell Decl. Ex. 21 at 55:13–20.)

### 7.  Civilian Complaints about Strip Searches

All civilian complaints are first received by the MVPD Chief of Police and then reviewed by the personnel lieutenant to determine if the complaint will be investigated by Internal Affairs

---

[19] Puff testified that, while in the Narcotics Unit, he never conducted a strip search on the street.  (Donnell Decl. Ex. 14 at 71:23–72:2.)

or by the immediate supervisor of the accused officer.  (PSOAF ¶¶ 39–40.)  The City's

representative testified in his deposition:

> If the complaint [obviously regards] illegality, that goes right to Internal Affairs.
> Otherwise, the recommendation of the personnel officer is to have the supervisor,
> the immediate supervisor prepare the . . . report with recommendations.  And then
> it goes through the chain of command . . . .  If it's a violation of the rules and
> regulations[,] there's a recommendation for disciplinary.  If it's a violation of law,
> the recommendation from the immediate supervisor would be. . . [to] forward[] [the
> complaint] to the Internal Affairs unit.

(PSOAF ¶ 41.)  The City generally directed civilian allegations of unlawful strip or body cavity

searches to be conducted by the accused officers' immediate supervisor.  (PSOAF ¶ 42.)  As

relevant here, Fegan was the supervisor of the Narcotics Unit from May 2013 to March 2020.

(Donnell Decl. Ex. 21 at 46:20–25.)  Fegan also testified in this Action that he was largely

responsible for investigating allegations of unlawful strip searches by his subordinate officers.

(PSOAF ¶ 43.)

    The City produced all civilian complaints against MVPD officers accused of misconduct

during the three years prior to November 7, 2017.  (PSOAF ¶ 24.)  A total of 52 complaints were

filed against MVPD officers during this three-year period.  (*Id.*).  Eight of these complaints

included allegations of unlawful strip or body cavity searches.  (*See* Donnell Decl. Ex. 18 (Dkt.

No. 135-19).)[20]  The City produced the investigative records for six of these complaints, (*see*

---

[20] Plaintiff has stated in his Statement of Additional Facts that there were 10 complaints
involving strip searches that occurred during this three-year period.  (PSOAF ¶ 25.)  However,
both Plaintiff and Defendants have included two complaints that the MVPD received during this
period that do not concern strip searches.
    The first complaint is designated in the MVPD's records as No. 14-51.  (Defs' 56.1 ¶ 79;
Pl's Resp. 56.1 ¶ 79.)  Plaintiff's expert has referenced this complaint as including an allegation
of a strip search in his spreadsheet reviewing all complaints that were received in discovery.
(Donnell Decl. Ex. 18 at 4.)  However, the Court excludes this complaint because the documents
provided to the Court include no reference to a strip search.  (*See generally* Donnell Decl. Ex. 29
(Dkt No. 135-30).)

Donnell Decl. Exs. 27, 30–32, 35, 37 (Dkt. Nos. 135-28, 31–33, 36, 38)), but the City did not

provide any records of an investigation into one complaint, (*see generally id.* Ex. 34 (Dkt. No.

135-35)) and provided only a summary of the investigation's findings for the other, (*see*

*generally id.* Ex. 33 (Dkt. No. 135-34)).[21]

The City also produced disciplinary histories and complaint records for the Officer

Defendants being sued in this Action.  (PSOAF ¶ 25.)  Six civilian complaints against the Officer

Defendants allege unlawful strip searches, and these complaints all pre- or post-date the three-

year period for which all complaints were disclosed.  (*See* Donnell Decl. Ex. 18 at 6 (Palmer);

Ex. 24 (Fegan) (Dkt. No. 135-25); Ex. 25 (Antonini) (Dkt. No. 135-26); Ex. 26 (Antonini) (Dkt.

No. 135-27); Ex. 28 (Fegan, Puff, Antonini) (Dkt. No. 135-29); Loomba Decl. Ex. MM

(Antonini) (Dkt. No. 125-44).)  The Parties have also included one additional complaint that

alleges an illegal strip search and that pre-dates the three-year period for which all complaints

were disclosed but involved an officer who is not a Defendant in this Action.  (*See* Donnell Decl.

---

The second complaint is designated in the MVPD's records as No. 17-11.  (Defs' 56.1
¶ 84; Pl's Resp. 56.1 ¶ 84.)  Plaintiff's expert has referenced this complaint as including an
allegation of a strip search in his spreadsheet reviewing all complaints that were received in
discovery.  (Donnell Decl. Ex. 18 at 6.)  Plaintiff has additionally alleged that this complaint
includes allegations of improper strip searches by two different individuals.  (Pl's Resp. 56.1
¶ 65.)  However, the Court excludes this complaint because the documents provided to the court
include no reference to a strip search.  (*See generally* Loomba Decl. Ex. LL (Dkt. No. 125-43);
Donnell Decl. Ex. 38 (Dkt. No. 135-39).)

[21] The Court notes that the Parties have not clarified in their submissions to the Court
whether the three-year period was calculated as the three years prior to November 17, 2017 (*i.e.*,
November 7, 2014 to November 7, 2017) or included all complaints received in the three
calendar years prior to 2017 (*i.e.*, January 1, 2014 to November 7, 2017).  The Court has
assumed that the latter interpretation is correct, as the number of complaints the MVPD received,
including those that actually do not include allegations of strip searches as discussed *supra* note
20, matches the number that Plaintiff has represented in his Statement of Additional Facts.
(PSOAF ¶ 25).

Ex. 36 (Dkt. No. 135-37).)  One of these fifteen complaints alleging unlawful strip searches involved separate allegations concerning strip searches from two different individuals, so the total number of strip-search related complaints is seventeen.  (Donnell Decl. Ex. 18; *see also id.* Ex. 28.)  Thus, in total, the City received at least seventeen complaints concerning illegal strip searches during the thirteen-year period from 2007 to 2020.  In addition to the two complaints referenced previously for which the City did not provide investigative records (*see id.* Exs. 33–34), the City also did not produce any records of an investigation into another complaint, (*see id.* Ex. 36), so the City completed investigations into fourteen of the seventeen complaints.  The initial investigation of at least six of these complaints was conducted by a supervisor of the officers who performed the strip search.  (PSOAF ¶¶ 44–49.)

MVPD internal investigations of civilian complaints are resolved into one of four categories: unfounded; unsubstantiated; substantiated; and exonerated.  (Defs' 56.1 ¶ 66; Pl's Resp. 56.1 ¶ 66.)  A complaint is deemed "unfounded" when, after an examination of the complaint and available evidence, there is no evidence to suggest the incident occurred as alleged.  (Defs' 56.1 ¶ 67; Pl's Resp. 56.1 ¶ 67.)  A complaint is deemed "unsubstantiated" when, after an examination of the complaint and all available evidence, there was insufficient evidence to prove or disprove the allegations made in the complaint.  (Donnell Decl. Ex 20 at 21:25–22:5 (Dkt. No. 135-21); Loomba Decl. Ex. G at 10:18–22 (Dkt. No. 125-10).)  A complaint is deemed "substantiated" when, after an examination of the complaint and all available evidence, it is determined that an incident occurred as alleged, and that the officer acted improperly.  (Defs' 56.1 ¶ 69; Pl's Resp. 56.1 ¶ 69.)  Finally, a complaint is deemed "exonerated" when, after an examination of the complaint and all available evidence, it is

determined that an incident occurred as alleged, but that the officer acted appropriately and did not violate any guidelines, rules, or laws.  (Defs' 56.1 ¶ 70; Pl's Resp. 56.1 ¶ 70.)

Of the fourteen complaints for which an investigation was completed, the MVPD never made a determination that a complaint was substantiated.  (*See* Donnell Decl. Ex. 18.)  For nine of the fourteen complaints for which records of the investigation were produced, the record indicates that the MVPD interviewed or attempted to interview the complainant as part of the investigative process.  (Donnell Decl. Exs. 25, 26, 27, 30–32, 35, 37; Loomba Decl. Ex. MM.)

In 2014, M.H. lodged a complaint that he had been subjected to a strip search and manual body cavity search.  (Donnell Decl. Ex. 27 at 25 (Dkt. No. 135-28).)  Ultimately, the MVPD determined that the officer who strip-searched the complainant had violated MVPD policy by failing to notify a supervisor prior to the strip search.  (PSOAF ¶ 57; *see also* Donnell Decl. Ex. 27.)  After making this determination, a supervising officer verbally counseled the officer who failed to follow the Policy and also sent out a memorandum to all officers directing them to review the Policy.  (*See* Donnell Decl. Ex. 27 at 5, 21.)[22]  The MVPD nonetheless found that M.H.'s allegations concerning the visual strip search and manual body cavity search were unfounded.  (*Id.* at 4–7.)

In 2014, the MVPD also investigated an allegation filed by M.D that he had been unlawfully strip searched when Antonini had him unclothe and then squat and cough.  (PSOAF ¶ 56; *see also* Donnell Decl. Ex. 32.)  The investigation found that when M.D. refused to squat, Fegan and another officer had forced M.D. to squat, and Antonini then slapped M.D. on his

---

[22] On March 31, 2017, Antonini directed another officer to search M.C., a suspect, and Fegan authorized the search.  (PSOAF ¶¶ 58–59.)  The officer then ordered M.C. to remove a plastic bag of drugs from her vagina.  (*Id.* ¶ 60.)  This event was not video recorded.  (*Id.* ¶ 61.) A strip search of another suspect, R.R., was also not recorded.  (*Id.* ¶ 62.)

naked buttocks.  (PSOAF ¶ 56.)  The MVPD took no action after investigating this complaint.
(Donnell Decl. Ex. 20 at 133:21-25 (Dkt. No. 135-21).)

In 2017, K.C. filed a civilian complaint that he was arrested, strip searched at MVPD
headquarters, and then released without being charged with a crime; the investigation confirmed
that K.C. had been strip searched based on a report from a CI that he was hiding drugs in his
groin and buttocks area and then released without being charged after no drugs were found
during the strip search.  (PSOAF ¶ 31; *see also generally* Donnell Decl. Ex. 35.)

### 8.  Lawsuits Concerning and External Investigations of MVPD's Use of Strip Searches

At least five lawsuits have been filed against the MVPD alleging unlawful strip and body
cavity searches.  (PSOAF ¶ 36.)

On March 17, 2021, Miriam Rocah, the Westchester County District Attorney, ("Rocah")
wrote a public letter to the Commissioner of the MVPD stating, in relevant part:

> I write to express my serious concern that certain members of the Mount Vernon
> Police Department may have illegally performed strip searches and body cavity
> searches of individuals as a matter of routine procedure incident to their arrests
> prior to my taking office on January 4, 2021.  My concern arises not from a single,
> isolated complaint, but from a number of them from 2012-20, making similar
> allegations of certain police officers illegally or inappropriately conducting . . .
> highly invasive searches without the high legal and/or factual predicate thresholds
> having been satisfied.  These and other incidents remain under investigation by my
> office.

(Donnell Decl. Ex. 23 at 2 (Dkt. 135-24).)

Rocah also addressed the Policy in her letter:

> [T]he MVPD written policy governing strip and body cavity searches has been in
> effect unchanged since 1993 and does not, in [this Office's] view, adequately lay
> out the extremely high factual and legal thresholds that must be met before such
> searches are undertaken.  Moreover, the number of complaints reviewed by this
> Office in connection with these types of searches, suggests that in prior cases the
> written policy is not being followed or enforced in letter or spirit.

(*Id.*)  Roach did not discuss any specific complaint that the Westchester County District

Attorney's Office ("WCDAO") was investigating and also did not point to any instance where

the WCDAO had made a finding of wrongdoing on the part of MVPD officers.  (*See generally*

*id.*)

On December 3, 2021, the Department of Justice ("DOJ") put out a press release stating

in relevant part that "the Justice Department has opened a pattern or practice investigation into

the [MVPD] . . . [to] assess MVPD's use of . . . strip and body cavity searches. . . . [and] will

conduct a comprehensive review of MVPD's systems of accountability, including complaint

intake, investigation, review, disposition and discipline."  (Donnell Decl. Ex. 39 at 2 (Dkt. No.

135-40).)  In public comments, Assistant Attorney General Kristen Clarke ("AAG Clarke")

noted that "reports indicate that [MVPD] officers routinely conducted searches without sufficient

legal basis, including strip searches, visual body cavity searches, and manual body cavity

searches, at times in public or in the presence of another person."  (*Id.* at 4–5.)  Neither DOJ nor

AAG Clarke addressed any specific complaints made against MVPD officers or indicated that

any findings of liability had been made.  (*See id*.)

B.  Procedural History

Plaintiff filed his Complaint in this Action on November 4, 2020.  (Compl. (Dkt. No. 1).)

Defendants filed a pre-motion letter on January 11, 2021.  (Letter from Andrew Quinn, Esq. to

Court (Jan. 11, 2021) (Dkt. No. 26).)  Plaintiff responded on January 15, 2021, (Letter from

Karen A. Newirth, Esq. to Court (Jan. 15, 2021) (Dkt. No. 27).)  On February 1, 2021, Plaintiff

filed his First Amended Complaint.  (*See* FAC.)  Defendants submitted their Answer on February

18, 2021.  (Answer (Dkt. No. 29).)

The Parties proposed a case management plan on July 15, 2021, (Dkt. No. 36), which the

Court approved at a conference the same day, (Dkt. (minute entry for July 15, 2021).)  The Court

also referred the Parties to Magistrate Judge Paul E. Davison for all non-dispositive, pre-trial matters. (*See* Order (Dkt. No. 37).)[23]

On June 30, 2022, Defendants submitted a pre-motion letter requesting to file for summary judgment. (Letter from Andrew Quinn, Esq. to Court (June 30, 2022) (Dkt. No. 108).) Plaintiffs responded on July 7, 2022. (Letter from Kelly Popkin, Esq. to Court (July 7, 2022) (Dkt. No. 109).) On August 3, 2022, the Court approved the Parties' proposed briefing schedule. (*See* Order (Dkt. No. 118).) On September 28, 2022, the Court approved the Parties' proposed stipulation dismissing Defendants Shawn Harris, Glen Scott, Robert Kressman, Sebastian Salazar, Patrick King, and Michael Hutchins and also dismissing Plaintiff's federal fair trial claim, state negligent hiring claim, and state negligent training claim from this Action. (*See* Stipulation (Dkt. No. 120).)

On September 30, 2022, Defendants filed their Motion for Partial Summary Judgment and accompanying papers. (Not. of Mot. (Dkt. No. 122); Defs' 56.1; Loomba Decl.; Mem. of Law in Supp. of Mot. for Summ. J. ("Defs' Mem.") (Dkt. No. 127).) After a request for an extension from the Parties that the Court granted (Dkt. Nos. 128–29), Plaintiff filed his opposition papers on December 2, 2022. (Pl's Opp'n; Pl's Resp. 56.1; PSOAF; Donnell Decl.) On December 23, 2022, Defendants filed their Reply. (Defs' Reply.)

---

[23] On March 8, 2022, Plaintiff objected to an order issued by Judge Davison denying a Motion To Compel. (*See* Pl's Obj. (Dkt. No. 78).) After briefing by the Parties, the Court rejected Plaintiff's objection on July 25, 2022. (Order (Dkt. No. 116).)

On May 4, 2022, Plaintiff submitted a letter motion requesting an extension of time to complete discovery. (Letter from Heather L. Donnell, Esq. to Court (May 4, 2022) (Dkt. No. 95).) After submissions from the Parties, the Court denied Plaintiff's request on May 11, 2022. (*See* Order (Dkt. No. 99).)

On May 23, 2022, Plaintiff moved before this Court to compel production of documents from Defendants. (*See* Mot. To Compel (Dkt. No. 100).) After briefing by the Parties, the Court issued an Order denying the Motion on July 18, 2022. (*See* Order (Dkt. No. 115).)

II.  Discussion

A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v.

John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to

award summary judgment, the court must construe the record evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v.

Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232,

240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute

exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also

Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4

(S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the non[-]movant's claim," in which case "the non[-]moving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order

to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d

114, 123 (2d Cir. 2013) (alteration, citation, and quotation marks omitted).  Further, "[t]o survive

a [summary judgment] motion . . ., [a non-movant] need[s] to create more than a 'metaphysical'

possibility that his allegations were correct; he need[s] to 'come forward with specific facts

showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d

Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the

pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Laby's. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v.*

*Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

### B.  Analysis

#### 1.  Unlawful Search

Plaintiff brings a claim for the unlawful search of his person against all of the Officer Defendants.  (FAC ¶¶ 122–27.)  Defendants argue that this claim fails because any search was conducted pursuant to a warrant based on probable cause.  (Defs' Mem. 18–19.)[24]  In the alternative, Defendants argue that the Officer Defendants are entitled to qualified immunity because they were entitled to rely on the facially valid warrant.  (*Id.* at 19–20.)  Plaintiff counters that there are issues of material fact that preclude summary judgment for Defendants because, viewing the evidence in the light most favorable to Plaintiff, there is evidence in the record that Puff made intentional misrepresentations in his affidavit and thus misled the magistrate.  (Pl's Opp'n 22–24.)  Plaintiff further argues that neither Puff nor Antonini is entitled to qualified immunity because disputes of material fact as to their knowledge must be presented to the finder of fact.  (Pl's Opp'n 25–26.)  The Court addresses each of these disputes in turn.

---

[24] In a footnote, Defendants have also argued that Plaintiff lacks standing to challenge the warrant to search Apartment 4N because Plaintiff has stated that he did not live there.  (Defs' Mem. 20 n.4.)  Plaintiff has not responded to this argument.  (*See generally* Pl's Opp'n.)  The Court finds that Defendants argument misconstrues the basis of Plaintiff's unlawful search claim, which arises from the search of his person, not the search of Apartment 4N.  (*See* FAC ¶¶ 122–27.)  Plaintiff has standing to challenge the search of his person.  *Cf. United States v. Morgan*, No. 09-CR-573, 2010 WL 4137539, at *12 (E.D.N.Y. June 22, 2010) (finding defendant had standing to challenge law enforcement officers' warrantless search of his person), *report and recommendation adopted in relevant part*, No. 09-CR-573, 2010 WL 4168624 (E.D.N.Y. Oct. 19, 2010).

a.  Probable Cause

"Probable cause for a search exists 'where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found.'"  *United States v. Feng Ling Liu*, No. 12-CR-934, 2014 WL 101672, at *3 (S.D.N.Y. Jan. 10, 2014) (alteration in original) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).  "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . ., including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Probable cause does not require direct evidence, and it may "be based on an accumulation of circumstantial evidence."  *United States v. Harding*, 273 F. Supp. 2d 411, 417–18 (S.D.N.Y. 2003).  "[C]ommon sense" inferences can support a finding of probable cause. *United States v. Bowen*, 689 F. Supp. 2d 675, 679–80 (S.D.N.Y. 2010), *aff'd sub nom United States v. Ingram*, 490 F. App'x 363 (2d Cir. 2012).

"[W]hen [a] warrant is based upon information obtained through the use of a confidential informant, courts assess the information by examining the 'totality of circumstances' bearing upon its reliability."  *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (citing *Gates*, 462 U.S. at 230–31 and *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991)).  Additionally, "as long as the applicant for the warrant accurately represents the information provided by an informant, probable cause is not defeated because the informant erred, or even lied, in his description of events."  *Robinson v. Golden*, No. 19-CV-406, 2022 WL 1224446, at *4 (N.D.N.Y. Apr. 26, 2022) (quoting *Smith*, 9 F.3d at 1014).

Law enforcement officers who act pursuant to a warrant are entitled to qualified immunity so long as they "had reasonable grounds to believe probable cause supported the warrant." *Martinez v. City of Schenectady*, 115 F.3d 111, 116 (2d Cir. 1997) (citation omitted). "[A] plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden." *Merriweather v. City of New York*, No. 12-CV-5258, 2015 WL 57399, at *7 (S.D.N.Y. Jan. 5, 2015) (citation omitted). To vitiate probable cause, a plaintiff must demonstrate that the person seeking the warrant "(1) 'knowingly and deliberately, or with a reckless disregard of the truth,' procured the warrant, (2) based on 'false statements or material omissions,' that (3) 'were necessary to the finding of probable cause[.]'" *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (quoting *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994)).

### b.  Corrected Affidavit Analysis

The plaintiff "challenging the warrant must make a substantial preliminary showing" of both a defendant's intent and the materiality of the misrepresentations or omissions. *Merriweather*, 2015 WL 57399, at *7 (quotation marks omitted). "To determine whether a false statement was necessary to a finding of probable cause, [a court must] consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." *Ganek*, 874 F.3d at 82. To correct the affidavit, the Court must "examine all of the information the officers possessed when they applied for the . . . warrant." *Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir. 2004). In determining whether misrepresentations or omissions were material, the Court considers the misrepresentations or omissions as a whole, not one-by-one. *See Washington v. Napolitano*, 29 F.4th 93, 107 (2d Cir. 2022) ("[T]here may be instances when no single omission or misrepresentation is sufficient to defeat a finding of probable cause, but the combined effect of the omissions and misrepresentations suffices to call into question the reliability of the affiant

26

and the affiant's witnesses such that the question of probable cause cannot be resolved on a summary judgment motion." (quoting *Andrews v. Scuilli*, 853 F.3d 690, 703 n.16 (3d Cir. 2017)), *cert. denied*, 143 S. Ct. 485 (2022).

"To determine whether a false statement was necessary to a finding of probable cause," courts consider a "hypothetical corrected affidavit," which either requires deleting any misstatements or adding any omitted ones.  *Ganek*, 874 F.3d at 82.  If a "corrected affidavit" still establishes probable cause, no Fourth Amendment violation has occurred, and summary judgment for the officers is appropriate under the first prong of the qualified immunity analysis. *Id.* (noting that "if probable cause remains after the warrant is corrected, plaintiff has suffered no violation of Fourth Amendment rights, and defendants would be entitled to qualified immunity and dismissal at the first step of the analysis" (quotation marks omitted)).  If it does not, then the Court must consider whether officials acted reasonably based on an "objectively reasonable— even if mistaken—belief that the corrected affidavit demonstrated the necessary probable cause." *Id.*  Insofar as such a belief is reasonable, the officers are shielded by qualified immunity because there was arguable probable cause; if not, they are not.  *Id.*; *see also Escalera*, 361 F.3d at 744 (holding that if corrected affidavit provides an "objective basis to support arguable probable cause, remaining factual disputes are not material to the issue of qualified immunity and summary judgment should be granted to the defendant on the basis of qualified immunity").

As a threshold matter, the Court notes that Plaintiff has not contested Defendants' argument that all of the Officer Defendants, except for Antonini and Puff, should be granted qualified immunity on this claim because they were entitled to rely on the facially sufficient warrant.  (Defs' Mem. 19–20; Defs' Reply 7.)  Because Plaintiff has not contested that qualified immunity should apply, (*see generally* Pl's Opp'n), the Court grants summary judgment on this

basis as to all Officer Defendants, except for Puff and Antonini, *see Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (finding that claims were deemed abandoned where plaintiff "fail[ed] to argue that they should survive [defendant's] motion for summary judgment" while arguing against the motion as to his other claims); *Bryant v. Steele*, 462 F. Supp. 3d 249, 270 (E.D.N.Y. 2020) ("A party abandons a claim in the context of a summary judgment motion when she does not respond to arguments concerning that claim."), *aff'd sub nom. Bryant v. Iheanacho*, 859 F. App'x 604 (2d Cir. 2021).

### i.  Puff

Plaintiff alleges that there are disputes of material fact that prevent the Court from determining, as a matter of law, whether Puff made material misrepresentations in his warrant affidavit.  (Pl's Opp'n 23–24.)  The Court agrees.

More specifically, Plaintiff argues that there is a question of fact as to whether Puff communicated with the CI *at all* because the record contains no text messages between the CI and Puff during October 2017.  (*Id.*)[25]  In a similar vein, Plaintiff argues that there is a question of fact as to whether the October 28, 2017 drug transaction between the CI and Plaintiff occurred because there is no evidence in the record to support that Puff paid the CI for a transaction that occurred on that date.  (*Id.* at 24.)  Finally, Plaintiff argues that Puff omitted relevant information when he failed to report the CI's controlled purchase of cocaine from Plaintiff that allegedly took

---

[25] Plaintiff makes several allegations regarding the accuracy of the CI's representations to Puff, but the Court notes that these alleged misrepresentations are relevant only insofar as Puff was aware of them, and Plaintiff has not argued that Puff had any knowledge of the falsity of these statements.  (Pl's Opp'n 23.)  *See Robinson*, 2022 WL 1224446, at *4 (explaining that "as long as the applicant for the warrant accurately represents the information provided by an informant, probable cause is not defeated because the informant erred, or even lied, in his description of events").

place on October 19, 2017.  (*Id.*)  The Court agrees with Plaintiff that the record supports that all

of these facts are in dispute between the Parties, *see supra* § I.A.2.

Defendants respond that these disputes of fact are insufficient to preclude summary

judgment because "merely denying the facts communicated by the CI to [Puff] is not sufficient

to show that Puff" made material misrepresentations in his affidavit.  (Defs' Reply 7.)  However,

the Court disagrees, as drawing all inferences in his favor, Plaintiff has established that Puff may

have entirely fabricated the CI's account because there is no corroboration for it in the record.

Thus, drawing all inferences for Plaintiff, a corrected affidavit would not support probable cause

because there would be no allegations concerning Plaintiff's alleged drug dealing and, thus, any

reason to search Plaintiff would rely solely upon Puff's own experience and background, which

is insufficient.  *See, e.g.*, *Calderon v. City of New York*, 138 F. Supp. 3d 593, 608 (S.D.N.Y.

2015) (explaining that "several district courts in this Circuit have held that, where there is no

evidence linking a defendant's residence to criminal activity and the affiant has merely predicted

based on experience that drug paraphernalia will be found there, there is no probable cause to

search that residence" and collecting cases).  As such, the Court also finds that no reasonable

officer in Puff's position could have determined—based on a corrected affidavit—that there was

even arguable probable cause.

Accordingly, because there are material issues of fact as to whether Puff fabricated the

report of the CI in his affidavit and, thus, whether probable cause for the warrant existed,

summary judgment must be denied.  *See Smith v. Famiano*, No. 17-CV-6535, 2023 WL

2710402, at *7–8 (E.D.N.Y. Mar. 30, 2023) (denying summary judgment where Plaintiff had

established genuine issue of material fact as to whether affiant had made misrepresentations to

magistrate); *Conroy v. Caron*, 275 F. Supp. 3d 328, 347 (D. Conn. 2017) (denying summary

judgment based on genuine issue of material fact as to whether affiant had falsified or omitted facts in affidavit).[26]

### ii.  Antonini

Plaintiff also argues that material disputes of fact prevent the Court from granting qualified immunity to Antonini.  (Pl's Opp'n 26.)  In particular, Plaintiff asserts that a reasonable jury could infer that Antonini could not have reasonably relied on Puff's warrant because, as a member of the MVPD Narcotics Unit, he would have been aware of the alleged October 19, 2017 drug buy and thus would have known that there was no need for a search warrant.  (*Id.*) Defendants counter that Antonini's knowledge of the October 19, 2017 controlled buy is irrelevant because, even if he was aware of the controlled buy, he still could have reasonably relied on the warrant as it was based on additional evidence that was collected after the buy occurred.  (Defs' Reply 7.)  The Court agrees with Defendants.

As the Court determined above, the corrected affidavit would not support probable cause. *See supra* § II.B.1.b.i.  Thus, the relevant question for qualified immunity purposes is whether an officer in Antonini's position would have had "reasonable grounds to believe probable cause supported the warrant" and thus that his reliance would have been supported by arguable probable cause.  *Martinez*, 115 F.3d at 116 (citation omitted).  Plaintiff has pointed to no evidence that Antonini was aware that Puff included misrepresentations in the affidavit and has not argued that the warrant itself was on its face deficient; Plaintiff has only asserted that the

---

[26] Because the Court has found there is a genuine dispute of material fact as to whether Puff fabricated the CI's account, the Court may not grant Puff qualified immunity for his actions. *See, e.g.*, *Torres v. City of New York*, No. 20-CV-4007, 2022 WL 955152, at *9 n.6 (E.D.N.Y. Mar. 30, 2022) ("[The] [d]efendants' argument that they are entitled to qualified immunity cannot save them as summary judgment is only appropriate if 'there is no dispute as to the pertinent events and the knowledge of the officers.' . . . Here, there are factual disputes as to the knowledge of [the defendants] and the pertinent events." (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996))).

record allows for the inference that Antonini was aware of the alleged October 19, 2017

controlled buy.  (Pl's Opp'n 26.)  Thus, Antonini is entitled to qualified immunity because he

had reasonable grounds to rely on a facially valid warrant that was supported by evidence of

Plaintiff's criminal activity other than the October 19, 2017 controlled buy.  *See, e.g.*, *Cogswell*

*v. Cnty. of Suffolk Deputy Sheriff's Dep't*, 375 F. Supp. 2d 182, 187 (E.D.N.Y. 2005) (finding

officers were entitled to qualified immunity where they had "no reason to suspect the validity of

[a] . . . warrant"); *cf. Gonzalez v. City of New York*, No. 01-CV-5584, 2006 WL 8435010, at *9

(E.D.N.Y. Jan. 3, 2006) (holding qualified immunity applied where officers executing valid

search warrant were unaware that they had been directed to the incorrect address).

### 2.  False Arrest

Plaintiff brings a claim for false arrest arising from the events of November 7, 2017.

(FAC ¶¶ 133–37.)  Defendants have moved for summary judgment, arguing that Plaintiff's guilty

plea in 2020 proves that Defendants, as a matter of law, had probable cause for Plaintiff's

November 7, 2017 arrest.  (Defs' Mem. 20–22.)

A § 1983 claim for false arrest "rest[s] on the Fourth Amendment right of an individual to

be free from unreasonable seizures, including arrest without probable cause."  *Weyant*, 101 F.3d

at 852.  A § 1983 false arrest claim is substantially the same as a claim of false arrest under New

York law.  *Id.*  New York law requires a plaintiff to show "that (1) the defendant intended to

confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent

to the confinement[,] and (4) the confinement was not otherwise privileged."  *Toussaint v.*

*County of Westchester*, 615 F. Supp. 3d 215, 224 (S.D.N.Y. 2022) (alteration in original)

(citation omitted).  "The existence of probable cause to arrest constitutes justification and is a

complete defense to an action for false arrest . . . under § 1983."  *Dillon v. Rosen*, No. 22-CV-

7035, 2022 WL 4538397, at *3 (S.D.N.Y. Sept. 28, 2022) (alteration in

31

original) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007)); *see also Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) ("The existence of probable cause to arrest . . . will defeat a claim of false arrest under the Fourth Amendment."). Thus, "a claim for false arrest will not lie so long as the arresting officer had probable cause to arrest the plaintiff for some crime." *Jaegly v. Couch*, 439 F.3d 149, 150 (2d Cir. 2006).

"[B]y pleading guilty to the crimes charged resulting from the purportedly false arrest, or to any lesser-included offenses to resolve all of the crimes charged, a plaintiff concedes as a matter of law that there was probable cause for all charges covered by the plea agreement." *Jones v. Rivera*, No. 13-CV-1042, 2015 WL 8362766, at *4 (S.D.N.Y. Dec. 7, 2015) (citing *Timmins v. Toto*, 91 F. App'x 165, 166–67 (2d Cir. 2004) and *Cameron v. Fogarty*, 806 F.2d 380, 387–89 (2d Cir. 1986)). "[T]his retroactive application of probable cause extends to all claims resolved by virtue of such a plea." *Parker v. Robenski*, No. 13-CV-668, 2015 WL 4041734, at *4 (N.D.N.Y. July 1, 2015) (citing *Harris v. City of New York*, No. 09-CV-3474, 2013 WL 4858333, at *6 (E.D.N.Y. Sept. 10, 2013)); *see also Harris*, 2013 WL 4858333, at *6 (finding false arrest claim was barred where plaintiff's guilty plea was in satisfaction of charges in an indictment as well as in a separate criminal complaint originating from the arrest plaintiff sought to challenge).

Because it is undisputed that Plaintiff's guilty plea was in satisfaction of the bail jumping charge as well as the charges in both the 2017 Complaint and 2018 Complaint, (Defs' 56.1 ¶¶ 50–51; Pl's Resp. 56.1 ¶¶ 50–51), the Court finds that Defendants should be granted summary judgment because, as a matter of law, the officers had probable cause to arrest Plaintiff, *see Horvath v. City of New York*, No. 12-CV-6005, 2015 WL 1757759, at *3 (E.D.N.Y. Apr. 17, 2015) (finding false arrest claims based on two different arrests barred by plaintiff's guilty plea

32

"in full satisfaction" of all pending charges); *Lluberes v. City of Troy*, No. 11-CV-1346, 2014 WL 1123413, at *15 (N.D.N.Y. Mar. 21, 2014) (granting summary judgment on plaintiff's false arrests claims where plaintiff had pled guilty to one count in full satisfaction of the charges that stemmed from arrests on two separate dates).[27]

### 3.  Personal Involvement

Defendants argue that Plaintiff has failed to demonstrate that any of the Officer Defendants were personally involved in the events at issue such that they could have intervened to prevent Antonini from allegedly violating Plaintiff's rights.  (Defs' Mem. 30, 32–33; Defs' Reply 10–12.)  Plaintiff asserts that he has produced sufficient evidence to raise disputes of material fact that must be resolved at trial.  (Pl's Opp'n 29–31, 34–35.)

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Sterling v.*

---

[27] Plaintiff's arguments to the contrary are without merit.  For example, Plaintiff asserts that his later guilty plea to bail jumping cannot provide probable cause for his earlier unrelated arrest.  (Pl's Opp'n 26.)  However, the undisputed record establishes that Plaintiff's guilty plea discharged not just the bail jumping charge, but also the charges arising out of the 2017 Complaint and the 2018 Complaint.  (Defs' 56.1 ¶ 51; Pl's Resp. 56.1 ¶ 51.)  Moreover, as Defendants point out, the charges are not unrelated because Plaintiff's bail jumping charge arose from his failure to appear at a hearing related to the 2017 Complaint.  (Defs' Reply 8; Defs' 56.1 ¶ 48–49; Pl's Resp. 56.1 ¶ 48–49.)

For much the same reason, Plaintiff's reliance on *Vincent v. Winski*, No. 14-CV-7744, 2018 WL 1441370 (S.D.N.Y. Mar. 22, 2018), is misplaced.  (Pl's Opp'n 26–27.)  The *Vincent* court found that the plaintiff's false arrest claim was not barred because it was "based on charges that—although covered by a guilty plea to another charge—did not arise out of the same events and arrest that led to the charge to which the . . . plaintiff pled guilty."  *Id.*  at *7.  Here, it is undisputed that the charge Plaintiff pled guilty to was related to the charge upon which he bases his false arrest claim, such that the bail jumping charge would not have existed had Plaintiff not been charged with the offenses alleged in the 2017 Complaint.  (Defs' Reply 8–9; Defs' 56.1 ¶ 48–49; Pl's Resp. 56.1 ¶ 48–49.)

The Court notes that Defendants also argue that they had an additional basis for probable cause due to Plaintiff's possession of cocaine or marijuana.  (Defs' Mem. 21–22; Defs' Reply 9.)  Because the Court finds Defendants had probable cause on a different basis, the Court declines to consider these arguments.

*Akinyombo*, No. 20-CV-10804, 2022 WL 2657223, at *4 (S.D.N.Y. July 8, 2022) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).  "[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quotation marks omitted); *see also Leneau v. Ponte*, No. 16-CV-776, 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018) (dismissing allegations against a defendant for lack of personal involvement because the "[p]laintiff's general allegation that all defendants were involved in the alleged constitutional violations does not rescue the claims against" a particular defendant).  Accordingly, "a plaintiff may not rely on a special test for supervisory liability"; instead, "[t]he violation must be established against the supervisory official directly." *Tangreti*, 983 F.3d 616–18.

Here, Plaintiff has pled sufficient facts to demonstrate that each of the Officer Defendants was personally involved in the alleged violations of his rights.[28]

### a. Quinoy

Plaintiff has adduced undisputed evidence that Quinoy was the commanding officer on the scene at the Bungalow Bar.  (Donnell Decl. Ex. 3 at 56:14–57:5, 60:19–61:2.)  Plaintiff has also adduced evidence that MVPD policy required that a supervising officer approve any strip search.  (Loomba Decl. Ex. V at 3.)  In addition, Plaintiff has presented evidence that most or all of the officers present at the Bungalow Bar were in the vicinity of the unmarked car, either standing 40–50 feet away in front of the Bungalow Bar or in another car across the street.  (Defs' 56.1 ¶ 87; Pl's Resp. 56.1 ¶ 87; Donnell Decl. Ex. 3 at 57:21–23.)

---

[28] The Court does not address Antonini's personal involvement in the events of November 7, 2017, because the Parties have agreed that Plaintiff's claims regarding the alleged strip searches and excessive use of force are not at issue in deciding Defendant's Motion.  *See supra* note 3.

Resolving all factual disputes in Plaintiff's favor, this evidence is sufficient to establish a question of material fact as to whether Quinoy was personally involved because a reasonable jury could find that he was close enough to the car to observe the alleged strip search and intervene to stop it and also find that Quinoy approved Antonini's strip search of Plaintiff in the unmarked car.

### b.  Puff

Plaintiff has adduced undisputed evidence that Puff was present at the Bungalow Bar when Plaintiff was arrested.  (Loomba Decl. Ex. H at 18:6–22; Donnell Decl. Ex. 3 at 58:12–60:10.)  As noted, Plaintiff also has presented evidence that most or all of the officers present at the Bungalow Bar were in the vicinity of the unmarked car, either standing 40–50 feet away in front of the Bungalow Bar or in another car across the street.  (Defs' 56.1 ¶ 87; Pl's Resp. 56.1 ¶ 78; Donnell Decl. Ex. 3 at 57:21–23.)  Puff returned to Apartment 4N after Plaintiff was arrested and was present for the search.  (Donnell Decl. Ex. 14 at 166:14–20.)

Resolving all factual disputes in Plaintiff's favor, this evidence is sufficient to establish a question of material fact as to whether Puff was personally involved in the first alleged strip search because a reasonable jury could find that he was close enough to the car to observe the alleged strip search and intervene to stop it.  Similarly, resolving all factual disputes in Plaintiff's favor, the available evidence is sufficient to establish a question of material fact as to whether Puff was personally involved with the second alleged strip search, because a reasonable jury could find that he was close enough to the bathroom to hear Plaintiff arguing with Antonini concerning the strip search and intervene to stop it.

### c.  Fegan

Plaintiff has adduced undisputed evidence that Fegan was the officer supervising the search of Apartment 4N, that he was in contact with Puff while Puff was at the Bungalow Bar,

and that he directed Puff to bring Plaintiff back to Apartment 4N.  (PSOAF ¶ 75.)  Additionally, Fegan was present in Apartment 4N after Plaintiff was brought there and allegedly strip searched in the bathroom.  (*Id.*)  It is undisputed that Apartment 4N is a small, railroad apartment. (Donnell Decl. Ex. 4 at 50:10–15; Donnell Decl. Ex. 51.)

Resolving all factual disputes in Plaintiff's favor, this evidence is sufficient to establish a question of material fact as to whether Fegan was personally involved in the alleged deprivations of Plaintiff's rights, because a reasonable jury could find that he authorized Antonini to conduct the strip search in the unmarked car and in the bathroom and because he was close enough to the bathroom to intervene to stop the strip search from occurring.

### d.  Valente

Plaintiff has provided undisputed evidence that Valente was present in Apartment 4N after Plaintiff was brought there and allegedly strip searched in the bathroom.  (Donnell Decl. Ex. 2 at 59:13–60:10.)  Further, it is undisputed that Apartment 4N is a small, railroad apartment. (Donnell Decl. Ex. 4 at 50:10–15; Donnell Decl. Ex. 51.)

Resolving all factual disputes in Plaintiff's favor, this evidence is sufficient to establish a question of material fact as to whether Valente was personally involved because a reasonable jury could find that he was close enough to the bathroom to hear Plaintiff arguing with Antonini concerning the strip search and intervene to stop it.

### e.  Palmer

Plaintiff has put forward undisputed evidence that Palmer was present in Apartment 4N after Plaintiff was brought there and allegedly strip searched in the bathroom.  (Donnell Decl. Ex. 1 at 144:10–13, 160:17–161:9, 231:20–232:19)  Again, it is undisputed that Apartment 4N is a small, railroad apartment.  (Donnell Decl. Ex. 4 at 50:10–15; Donnell Decl. Ex. 51.)

Resolving all factual disputes in Plaintiff's favor, this evidence is sufficient to establish a question of material fact as to whether Palmer was personally involved because a reasonable jury could find that she was close enough to the bathroom to hear Plaintiff arguing with Antonini concerning the strip search and intervene to stop it.

### 4. Failure to Intervene

Defendants argue that summary judgment should be granted on Plaintiff's claim that Defendants failed to intervene when Puff filed a false incident report and false felony complaint and Antonini filed a false felony complaint and planted narcotics on him. (Defs' Mem. 23.)

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "Liability may attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988)); *see also Valverde v. Folks*, No. 19-CV-8080, 2020 WL 5849515, at *7 (S.D.N.Y. Sept. 30, 2020) (same); *Bouche v. City of Mount Vernon*, No. 11-CV-5246, 2012 WL 987592, at *5 (S.D.N.Y. Mar. 23, 2012) (same). "The essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a 'tacit collaborator' in the unlawful conduct of another." *Figueroa*, 825 F.3d at 107–08. Because "[w]hether an officer was capable of preventing the harm and had sufficient time to intercede" is highly circumstance- and fact-driven, courts generally treat it as "an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not

possibly conclude otherwise." *Gardner v. City of New York*, No. 16-CV-6476, 2021 WL 3848112, at *7 (E.D.N.Y. Aug. 27, 2021) (quoting *Branen*, 17 F.3d at 557).

A failure to intervene claim cannot proceed where there is no underlying constitutional violation, because "if there is no underlying illegal action that the officer should have been aware of, the officer cannot be liable as a tacit collaborator." *Ramos v. Poore*, No. 15-CV-518, 2017 WL 4765644, at *3 (D. Conn. Oct. 20, 2017); *see also Anderson v. Waterbury Police Dep't*, No. 14-CV-829, 2017 WL 1157843, at *13 (D. Conn. Mar. 28, 2017) ("[T]o the extent that there is no valid claim that one police officer violated an individual's rights, there also will be no valid failure to intervene claim arising from that same course of events[.]" (citing *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 599 (S.D.N.Y. 2013))).

Here, because the Court has granted summary judgment on Plaintiff's false arrest claim and Plaintiff has abandoned his malicious prosecution claims, the Court grants summary judgment to the Defendants on the failure to intervene claims related to Plaintiff's arrest and subsequent prosecution. *See Soto v. City of New York*, 132 F. Supp. 3d 424, 459 (E.D.N.Y. 2015) (granting summary judgment for defendants on failure to intervene claim where underlying claims for false arrest and malicious prosecution failed); *Usavage*, 932 F. Supp. 2d at 599 (explaining that "[w]here the record does not disclose an underlying [constitutional] violation, and does not suggest that an officer who observed the disputed incident could have been aware of the [violation], summary judgment on a duty to intercede claim is appropriate"); *Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296, 308 (D. Conn. 2009) (holding that since one defendant "did not violate [plaintiff]'s Fourth Amendment rights, [another defendant could not] be held liable for failing to intervene to prevent a violation of those rights").

As to the alleged strip search that occurred in the unmarked car, the Court finds that there are disputes of material fact that require resolution at trial as to Puff and Quinoy's failure to intervene.  *See supra* § II.B.3.  Drawing all inferences and resolving all factual disputes in Plaintiff's favor, a jury could find Puff and Quinoy failed to intervene to stop the strip search in the unmarked car because they were located near enough to the car to observe the search as it occurred and did nothing.  *See Jean-Laurent*, 540 F. Supp. at 512–513 (denying summary judgment on failure to intervene claim where the strip search was of a sufficiently long duration and there remained issues of material fact as to whether Plaintiff's constitutional rights were violated by the strip search); *West v. Harkness*, No. 17-CV-621, 2021 WL 4289515, at *15 (N.D.N.Y. Sept. 21, 2021) (denying summary judgment on failure to intervene claim where defendants were close to plaintiff and had sufficient time to intervene, even though alleged improper search was brief), *reconsideration denied*, 2021 WL 5321958 (N.D.N.Y. Nov. 16, 2021), *appeal withdrawn*, No. 21-2679, 2022 WL 1224721 (2d Cir. Jan. 21, 2022); *Johnson v. Brown*, No. 20-CV-622, 2022 WL 7288498, at *23–24 (N.D.N.Y. May 12, 2022) (denying summary judgment on failure to intervene where questions of fact existed as to officers' conduct), *report and recommendation adopted*, 2022 WL 4395995 (N.D.N.Y. Sept. 23, 2022); *Hardy v. Baird*, No. 13-CV-7402, 2016 WL 2745852, at *12 (S.D.N.Y. May 10, 2016) (denying summary judgment where defendant was present during alleged unlawful strip search and cavity search by other officers); *Cordero v. City of New York*, 282 F. Supp. 3d 549, 565 (E.D.N.Y. 2017) (denying summary judgment where there was an issue of material fact as to whether defendant was present during alleged illegal search); *cf. Caceres v. Port Auth of N.Y. & N.J.*, No. 06-CV-1558, 2008 WL 4386851, at *8 (S.D.N.Y. Sept. 24, 2008) ("Because there remain genuine issues of material fact as to whether the defendants violated the plaintiff's constitutional

rights, there also remain genuine issues of material fact as to whether the defendants had a duty to intervene."). However, Plaintiff has adduced no evidence that Fegan, Valente, or Palmer were present at the Bungalow Bar, so they could not be liable for failure to intervene in connection with the alleged strip search in the unmarked car because they would have had no opportunity to do so. *See supra* § II.B.3.[29]

Similarly, as to the alleged strip search that occurred in the bathroom of Apartment 4N, there are disputes of material fact that require resolution at trial as to Fegan, Valente, Puff, and Palmer's failure to intervene. *See supra* § II.B.3. Drawing all inferences and resolving all factual disputes in Plaintiff's favor, a jury could find that any or all of these officers failed to intervene to stop the strip search in the bathroom of Apartment 4N, because it is undisputed they were all in the apartment and that Apartment 4N was sufficiently small that they would have heard Plaintiff yelling about the search before it occurred. *See Jean-Laurent*, 540 F. Supp. 2d at 512–513; *Caceres*, 2008 WL 4386851, at *8; *Hardy*, 2016 WL 2745852, at *12. However, Plaintiff has presented no evidence that Quinoy was ever present at Apartment 4N, so he cannot

---

[29] The Court agrees with Plaintiff that Fegan and Quinoy may be liable for their personal involvement in ordering or approving the alleged strip search Antonini conducted at the Bungalow Bar, because there is evidence that Fegan and Quinoy were in contact with the officers while they were locating Plaintiff, that Fegan directed that Plaintiff be returned to Apartment 4N, and that Fegan or Quinoy, as supervisors, were required by MVPD policy to approve the search. (Pl's Opp'n 29–31.) However, if a jury were to make the finding that Fegan ordered the unlawful strip search, Fegan could not then also be liable, as a matter of law, under a failure to intervene theory. *Taylor v. City of New York*, No. 19-CV-6754, 2022 WL 744037, at *21 (S.D.N.Y. Mar. 11, 2022) ("It is well established that a plaintiff may not state a claim for failure to intervene against an officer who directly participated in the allegedly unlawful conduct."); *Case v. City of New York*, 233 F. Supp. 3d 372, 402 (S.D.N.Y. 2017) ("[A] defendant cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop [himself] from committing that violation." (alteration in original) (quotation marks omitted)).

For Quinoy, the possibilities are more complex, as he could be liable for a failure to intervene if Fegan only was found to have ordered the search at the Bungalow Bar. However, if both Quinoy and Fegan were found to have ordered the search or if Quinoy alone ordered it, Quinoy would then only be liable for directing the unlawful search, not for a failure to intervene.

be liable for failure to intervene in connection with the alleged strip search therein because he would have had no opportunity to do so.[30]

### 5.  Plaintiff's Expert

Defendants have raised a challenge to the admissibility of Plaintiff's expert opinion and have also objected that Plaintiff's expert is improperly testifying to the ultimate issue of whether there was a widespread pattern or practice of illegal strip searches.  (Defs' Reply 15–16.)

At the summary judgment stage, a court can "decide questions regarding the admissibility of evidence, including expert opinion evidence[.]"  *Gjini v. United States*, No. 16-CV-3707, 2019 WL 498350, at *13 (S.D.N.Y. Feb. 8, 2019) (alteration in original) (quoting *Bah v. Nordson Corp.*, No. 00-CV-9060, 2005 WL 1813023, at *6 (S.D.N.Y. Aug. 1, 2005)).  "If a proffer of expert testimony is excluded as inadmissible pursuant to [Federal Rule of Evidence] 702, the court must make the summary judgment determination on a record that does not include that evidence."  *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001).  Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Although it is the role of the jury to determine the credibility of an expert witness, it is the role of the trial court to serve as a "gatekeep[er]" to ensure that the expert testimony is

---

[30] Plaintiff has also produced no evidence that Quinoy remained in contact with Puff and the other officers when they left the Bungalow Bar to return to Apartment 4N, (*see* Pl's Opp'n 31), so the Court finds that a claim of his direct involvement would also be foreclosed, *see supra* § II.B.3.

reliable and relevant before it is presented to the jury.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (finding that the trial judge's gatekeeping obligation applies to all expert testimony); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (holding that the district court must ensure that a witness is qualified as an expert and "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."  *I.M. v. United States*, 362 F. Supp. 3d 161, 191 (S.D.N.Y. 2019) (alteration in original) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 635 (S.D.N.Y. 2016) (same).  "[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]"  *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962); *see also Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213 (2d Cir. 2009) ("The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous.").

The Court must first address "the threshold question of whether a witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions." *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quotation marks omitted).  In doing so, the Court asks "whether the proffered expert has the educational background or training in a relevant field . . . by looking at the totality of the witness's background."  *Arista Recs. LLC v. Lime Grp. LLC*, No. 06-CV-5936, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) (citations and quotation marks omitted).  Then, the Court must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony" to "ensure that the expert will actually be testifying on issues or subject

matters within his or her area of expertise." *Id.* (alteration quotation marks omitted). Courts in the Second Circuit liberally construe the expert qualifications requirement, and generally will not exclude expert testimony provided "the expert has educational and experiential qualifications in a general field closely related to the subject matter in question[.]" *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience.").

Plaintiff's expert, Craig Miller ("Miller"), worked in law enforcement for over 30 years, including as a patrol officer and supervisor in multiple police departments and, as relevant here, served as a lieutenant in the Narcotics Division of the Dallas Police Department from 1997–2003. (Donnell Decl. Ex. 15 ("Miller Report") at 2–3 (Dkt. No. 135-16).) Defendant does not contest Miller's qualifications, (*see generally* Defs' Reply), and the Court finds that he has relevant experience and qualifications to render an expert opinion in this Action.

However, this does not end the Court's inquiry into the admissibility of Miller's expert testimony. Defendants argue that four of Miller's opinions are inadmissible because "[P]laintiff is using them to prove an ultimate issue . . . namely that a widespread practice of conducting illegal strip searches exists." (Defs' Reply 16.)

An expert's role, under Federal Rule of Evidence 702(a), is to assist the trier of fact in "understand[ing] the evidence" or "determin[ing] a fact in issue," not to dictate either the facts or the law to the jury. Fed. R. Evid. 702(a); *see also Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-CV-8645, 2018 WL 1889763, at *3 (S.D.N.Y. Apr. 18, 2018) ("[E]xpert testimony may not

usurp the province of the judge to instruct on the law, or of the jury to make factual

determinations.").  "Thus, while 'an opinion is not objectionable just because it embraces an

ultimate issue,' the Second Circuit 'is in accord with other circuits in requiring exclusion of

expert testimony that expresses a legal conclusion.'"  *Joint Stock Co. Channel One Russ.*

*Worldwide v. Infomir LLC*, No. 16-CV-1318, 2021 WL 4810266, at *14 (S.D.N.Y. Sept. 30,

2021) (citations omitted) (quoting Fed. R. Evid. 704(a) and then quoting *Hygh v. Jacobs*, 961

F.2d 359, 363 (2d Cir. 1992)); *see also United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.

1991) ("[A]lthough an expert may opine on an issue of fact within the jury's province, he may

not give testimony stating ultimate legal conclusions based on those facts.").  "[T]he general rule

is that an expert may not testify as to what the law is, because such testimony would impinge on

the trial court's function."  *In re Air Disaster at Lockerbie Scot. on Dec. 21, 1988*, 37 F.3d 804,

826–27 (2d Cir. 1994), *abrogated on other grounds by Zicherman v. Korean Air Lines Co. Ltd.*,

516 U.S. 217 (1996).  "Whereas an expert may be uniquely qualified by experience to assist the

trier of fact, he is not qualified to compete with the judge in the function of instructing the jury

[on the law]."  *Hygh*, 961 F.2d at 364.

Defendants object to the following statements in Miller's Report and deposition:

1. There are certain cases like the strip search of [M.H.] where people were stripped searched and then released and not charged with any crime.  *Strip searches should not be commonplace and [M.H.'s] search without him being charged is a confirmation . . . that MVPD did these as a matter of routine business.*  (Miller Report at 20 (emphasis added).)

2. *To the extent that [officers] were permitted to conduct strip and body cavity searches without any disciplinary action, corrective action with training and/or supervision, future violations were going to occur.*  (*Id.* at 20 (emphasis added).)

3. It is my opinion that any complaint involving a strip search should have been considered a serious incident and investigated by Internal Affairs, rather than [Fegan], for the investigation to comply with accepted police practices.  [The City]'s repeated and continued assignment of investigations of allegations of

strip and body cavity searches to be conducted by the supervising and authorizing sergeant was a far departure from the accepted standards and procedures of investigations of officers accused of misconduct as of 2017. *It is unsurprising that not a single one of these investigations resulted in a founded finding, discipline, and/or corrective action such as additional supervision and/or training.* (*Id.* at 20–21.)

4. In my nearly 30-year career at the Dallas Police Department, I never saw a single strip search complaint come in against an officer in a department, the eighth largest department in America. I observed in my review of this case and [another] case, more than a dozen -- more than 15 instances where strip search complaints were made against the [N]arcotics [U]nit of the [MVPD]; so it's my professional opinion that . . . that is an extremely high number of complaints based on what I saw in my career. (Donnell Decl. Ex. 16 ("Miller Dep.") at 57:6–19 (Dkt. No. 135-17).)

The Court agrees with Defendants that the italicized portions of Miller's first three opinions are testimony that impermissibly concludes that the City should be held liable for a widespread pattern or practice of unconstitutional strip searches. *Paul v. City of New York*, No. 16-CV-1952, 2023 WL 3724152, at *6 (S.D.N.Y. May 30, 2023) (barring expert from offering "conclusory, ultimate issue opinions" at trial including the opinion that "the type and amount of force used by the officers . . . was excessive"); *McGrier v. City of New York*, No. 16-CV-5667, 2019 WL 1115053, at *8 (S.D.N.Y. Mar. 11, 2019) (disregarding expert opinion on existence of probable cause in part because the existence of probable cause was a "question of law for the [c]ourt, not an expert witness"), *aff'd*, 849 F. App'x 268 (2d Cir. 2021); *Howard v. Town of Dewitt*, No. 12-CV-870, 2014 WL 12591690, at *4 (N.D.N.Y. Dec. 15, 2014) (excluding police practices expert's report that was composed of "a recitation of the facts of the case and a series of conclusions about how the law should be applied to those facts"). The Court also agrees with Defendants that these three opinions are conclusory, (Defs' Reply 16), as Miller provides no explanation as to how he moves from the materials he reviewed to a finding of municipal liability, *cf. Whitfield v. City of Newburgh*, No. 08-CV-8516, 2015 WL 9275695, at *27

45

(S.D.N.Y. Dec. 17, 2015) (disregarding testimony where the "expert's ipse dixit statement [concerned] a purported inadequacy in a municipality's training program, i.e., that it [was] against the industry standard, and that this [inadequacy] somehow constitute[d] a constitutional violation").

As to the final opinion, the Court finds that this opinion is permissible because, as an expert, Miller may testify based on his experience and background knowledge of police practices. *Grajeda v. Vail Resorts Inc.*, No. 20-CV-165, 2022 WL 17848967, at *2 (D. Vt. Dec. 22, 2022) ("An expert witness's testimony may be based on experience[.]"). Defendants object that in his deposition, Miller failed to satisfactorily defend the basis of his opinion, (Defs' Reply 16), but Miller's ability to provide additional support for his opinions, outside of his own experience, goes to the weight that the finder of fact should give to Miller's opinion, which Defendants are free to address on cross-examination and in arguments to the jury, *see, e.g.*, *United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) ("[F]actors which make evidence less than conclusive affect only weight, not admissibility." (citation omitted)); *see also United States v. Mustafa*, 753 F. App'x 22, 36 (2d Cir. 2018) (summary order) (same).

### 6.  *Monell* Claim

Defendants argue that they should be granted summary judgment on Plaintiff's *Monell* claim related to the alleged unlawful strip searches because, whether based on a widespread practice or on a failure to train or supervise, the claim fails as a matter of law.  (Defs' Mem. 24–30; Defs' Reply 13–20.)

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013).  "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a

constitutional tort." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *cf. Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (recommending dismissal of a claim against agencies where plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester County*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Apr. 16, 2010) (recommending dismissal of a claim against county because complaint "does not allege the existence of an unconstitutional custom or policy"), *adopted as modified sub nom. Arnold v. Westchester Cnty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010).  The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right.").  In other words, a municipality may not be liable under Section 1983 "by application of the doctrine of *respondeat superior*." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong" (emphasis in original)).  Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of*

*Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

"In determining municipal liability, it is [therefore] necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom'" that caused the alleged injury. *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). Generally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation."). In the end, therefore, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged

injury." *Roe*, 542 F.3d at 37 (quoting *Brown*, 520 U.S. at 404); *see also Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation.  There must at least be an affirmative link between [for example] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis in original)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (quotation marks omitted)).

### a.  Civilian Complaints, Lawsuits, and External Investigations

As discussed above, the City received eight complaints concerning strip searches in the three years prior to the alleged unlawful searches of Plaintiff and failed to provide records of the investigation into two of these complaints.  *See supra* § I.A.7.  The Parties do not dispute that the City found none of these complaints was substantiated.  *Id*.  As relevant here, it is well settled that when "a complaint, whether administrative or by way of a civil action, is filed against an officer, it [does not] follow[] ipso facto that he is guilty of a constitutional violation[.]" *Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 409 (E.D.N.Y. 2011).

It is also undisputed that there have been at least five lawsuits filed against the City and its officers alleging constitutional violations related to strip searches.  (PSOAF ¶ 36.)  Only one of these lawsuits resulted in a finding of liability.  *See Flores v. City of Mount Vernon*, 41 F. Supp. 2d 439, 446 (S.D.N.Y. 1999).  The other cases were either dismissed by stipulation of the parties or settled without an admission of liability by the City.  (*See* Order of Dismissal (Dkt.

No. 68, 14-CV-4441 Dkt.); Order (Dkt. No. 12, 05-CV-8052 Dkt.); Stip. of Discontinuance

(Dkt. No. 87, 10-CV-707 Dkt.); Stip. of Discontinuance (Dkt. No. 32, 09-CV-8982 Dkt.)).  The

decision in *Flores* does not provide support that there was a widespread practice of

unconstitutional strip searches at the time Plaintiff was searched because the finding of liability

was premised on the execution of a strip search pursuant to an admitted policy of strip searching

everyone who was arrested for narcotics activity more than twenty years earlier.  *Flores*, 41 F.

Supp. 2d at 441–42.

　　　Finally, it is undisputed that DOJ has opened a pattern-and-practice investigation into the

MVPD but that no findings of liability have been made.  (*See generally* Donnell Decl. Ex. 39.)

### b.  Failure To Train

　　　Plaintiff argues that the unconstitutional strip searches he experienced resulted from a

failure on the part of the MVPD to properly train the Defendants on when and how to conduct

constitutionally permissible searches.  (Pl's Opp'n 11–12, 15–16.)

　　　A failure to train constitutes a policy or custom that is actionable under § 1983 only

where "in light of the duties assigned to specific officers or employees[,] the need for more or

different training is so obvious, and the inadequacy so likely to result in the violation of

constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately

indifferent to the need."  *City of Canton*, 489 U.S. at 390.

　　　"To establish deliberate indifference[,] a plaintiff must show that a policymaking official

was aware of constitutional injury, or the risk of constitutional injury, but failed to take

appropriate action to prevent or sanction violations of constitutional rights."  *Jones v. Town of

East Haven*, 691 F.3d 72, 81 (2d Cir. 2012).  "[D]eliberate indifference is a stringent standard of

fault, and necessarily depends on a careful assessment of the facts at issue in a particular case."

*Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (citations and internal quotation marks

omitted).  "The operative inquiry," in turn, "is whether those facts demonstrate that the policymaker's inaction was the result of conscious choice and not mere negligence." *Id.* (internal quotation marks omitted); *see also Jones*, 691 F.3d at 81 ("[D]emonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent.").  A jury may infer deliberate indifference "where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs." *Cash*, 654 F.3d at 334 (citations, alterations, and internal quotation marks omitted).  The Supreme Court has cautioned that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

The Second Circuit has identified three requirements to determine whether a "failure to train . . . constitutes deliberate indifference." *Jenkins*, 478 F.3d at 94.  The plaintiff must show "[(1)] that [the] policymaker knows to a moral certainty that her employees will confront a given situation . . .[,] [(2)] that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation . . . [,] [and] [(3)] that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* (citations and internal quotation marks omitted).  "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick,* 563 U.S. at 131(quotation marks omitted).

"Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal

liability." *Id.* (internal quotation marks omitted); *see also City of Canton,* 489 U.S. at

389 (explaining that a city may be liable under Section 1983 "[o]nly where a failure to train

reflects a 'deliberate' or 'conscious' choice by a municipality").  Moreover, "at the summary

judgment stage, plaintiffs must identify a specific deficiency in the city's training program and

establish that the deficiency is closely related to the ultimate injury, such that it actually caused

the constitutional deprivation." *Jenkins*, 478 F.3d at 94 (quotation marks omitted).  While

"[r]ecurring civil rights complaints can put a municipality on notice of deficiencies in its training

program . . . [t]here is no bright-line rule for how many civil rights complaints there must be, or

how recent the complaints must be, to put a municipality on notice." *Buari v. City of New York*,

530 F. Supp. 3d 356, 399 (S.D.N.Y. 2021) (first citing *Breton v. City of New York*, 404 F. Supp.

3d 799, 818 (S.D.N.Y. 2019) and then citing *Tieman v. City of Newburgh*, No. 13-CV-4178,

2015 WL 1379652, at *20 (S.D.N.Y. Mar. 26, 2015)).

  Defendants argue that Plaintiff has failed to demonstrate any deficiency in the City's

training or guidelines, as Plaintiff has not objected to the Policy or Supplemental Policy but

instead attempted to demonstrate that there was a widespread practice of not complying with

them.  (Defs' Mem. 29.)  Plaintiff argues in response that the City was on notice and failed to

properly train officers on the appropriate use of strip searches because (1) deposition testimony

indicates that the officers did not receive training and the Officer Defendants' training records

also indicate that they received no training and (2) the City received a number of complaints

concerning strip searches over multiple years.  (Pl's Opp'n 11–12, 15.)

  However, the Court finds that the record does not support Plaintiff's contention that no

training was provided to the City's officers or his contention that the City failed adequately to

respond to the complaints as they were received.  As to Plaintiff's first contention, there is

undisputed evidence in the record that officers received on-the-job training in conducting strip

searches.  *See supra* § I.A.6.  Such informal training has been found sufficient by other courts,

and Plaintiff has not identified a reason why this Court should deem it insufficient here.  *See*

*House v. City of New York*, No. 18-CV-6693, 2020 WL 6891830, at *18–19 (S.D.N.Y. Nov. 24,

2020) (finding defendant's on-the-job training sufficient to rebut *Monell* claim for failure to

train); *Alwan v. City of New York*, 311 F. Supp. 3d 570, 580 (E.D.N.Y. 2018) (finding "on-the-

job training" sufficient where Plaintiff had provided no explanation as to why it was inadequate);

*Phillips ex rel. Green v. City of New York*, 453 F. Supp. 2d 690, 727–28 (S.D.N.Y. 2006)

(finding defendant municipality provided sufficient training where it was "provided on the job

rather than prior to employment")*.*  Additionally, it is undisputed that the Policy was in place at

all relevant times and that the City on at least one occasion directed officers to review the Policy

when put on notice that an officer had failed to comply with it in conducting a strip search.  *See*

*supra* § I.A.7.

  As to Plaintiff's second contention, the undisputed record reflects that the City did

respond to the numerous complaints it received by implementing the Supplemental Policy to

ensure that strip searches were properly documented so that any complaints could be fully

investigated.  *See supra* § I.A.5.

  Thus, even drawing all inferences in Plaintiff's favor, Plaintiff failure to train claim fails

because he has not established an issue of material fact on two issues.  First, given that the Policy

existed and that officers were provided training, Plaintiff has failed to identify a specific

deficiency with the training the City provided, as required by *Monell* and its progeny.  (*See*

*generally* Pl's Opp'n.)  The record simply does not support Plaintiff's contention that there was

"no training," and Plaintiff has not otherwise identified any deficiencies with the Policy or

Supplemental Policy or how they were implemented by the City.  *See Wilson v. City of New York*, No. 15-CV-7368, 2018 WL 4636823, at *4 (S.D.N.Y. Sept. 26, 2018) (granting summary judgment on failure to train claim where plaintiff failed to identify "any particular deficiency existed" with the training provided by defendant); *Hanson v. New York City*, No. 15-CV-1447, 2018 WL 1513632, at *21 (E.D.N.Y. Mar. 27, 2018) (finding "general references to the deficiencies in the patrol guide, inadequate disciplinary actions, and the absence of [trainings]" were "not sufficiently specific" to impose liability for failure to train (quotation marks omitted)); *cf. Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440–41 (2d Cir. 2009) ("The plaintiff must offer evidence to support the conclusion that the training program was inadequate, not '[t]hat a particular officer may be unsatisfactorily trained' or that 'an otherwise sound program has occasionally been negligently administered,' and that a 'hypothetically well-trained officer' would have avoided the constitutional violation." (alteration in original) (quoting *City of Canton*, 489 U.S. at 390–91)).

Second, because Plaintiff has not identified a specific deficiency, Plaintiff cannot show that any broad failure to train caused his injury.  *See City of Canton*, 489 U.S. at 390-91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipality], for the officer's shortcomings may have resulted from factors other than a faulty training program."); *Khan v. City of New York*, No. 19-CV-104, 2022 WL 3100941, at *11 (S.D.N.Y. Aug. 4, 2022) (finding that failure-to-train theory failed where plaintiff's harm resulted from actions of individual officers, not municipality's training or lack thereof); *Roe*, 542 F.3d at 36–37 ("Liability for unauthorized acts is personal; to hold the municipality liable, . . . the agent's actions must implement rather than frustrate the government's policy.").

c.  Failure to Supervise

Next, Plaintiff argues that the City failed properly to supervise the Officer Defendants because the City's policy of directing supervising officers to investigate strip search complaints led to a conflict of interest since the officer investigating the complaint was also the officer who was required by MVPD policy to have approved the search.  (Pl's Opp'n 12, 16.)  Plaintiff also alleges that, even where a violation of MVPD policy was found based on the conflicted investigations, there was no corrective action taken.  (*Id.*)

"To establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations."  *Lopes v. Westchester County*, No. 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020) (citation omitted).  Alternatively, "a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality consistently failed to discipline those involved."  *Tieman*, 2015 WL 1379652, at *21 .  To establish deliberate indifference for a failure to supervise and/or discipline claim, the plaintiff must show that "the need for more or better supervision to protect against constitutional violations was obvious," which may be established "through proof of repeated complaints of civil rights violations . . . if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."  *Buari*, 530 F. Supp. 3d at 400 (citation omitted); *see also Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 127 (2d Cir. 2004) (same).  Where a municipality does respond to the complaints, plaintiffs face "a heavy burden of proof in showing that the . . . response was so patently inadequate to the task as to amount to deliberate indifference[,]" and such inadequacy must reflect "a deliberate choice among various

alternatives, rather than negligence or bureaucratic inaction." *Reynolds v. Giuliani*, 506 F.3d 183, 192–93 (2d Cir. 2007).

"[C]onstru[ing] the record evidence in the light most favorable to [Plaintiff]] and draw[ing] all reasonable inferences in [his] favor," *Torcivia*, 17 F.4th at 354, the Court finds that Plaintiffs have proffered sufficient evidence from which a reasonable factfinder could conclude that the necessity for more supervision in connection with MVPD officers' strip-searching practices was obvious and that the City's failure properly to supervise its officers resulted in the violation of Plaintiff's constitutional rights.

As an initial matter, there is ample evidence of "a pattern of allegations of or complaints about . . . similar unconstitutional activity." *Lopes*, 2020 WL 1445729, at *5; *Tieman*, 2015 WL 1379652, at *21. It is undisputed that there have been at least five lawsuits filed against the City and its officers alleging constitutional violations related to strip searches. (PSOAF ¶ 36.) Further, the record reflects that the City received eight civilian complaints concerning strip searches in the three years prior to the alleged unlawful searches at issue in this case. *See supra* §§ I.A.7, II.B.6.a. To be sure, only one lawsuit, which is of very limited probative value, has yielded a finding of liability to date, and none of the civilian complaints has been substantiated. *See id.* However, an obvious need "for more or better supervision to protect against constitutional violations . . . may be demonstrated through proof of repeated *complaints* of civil rights violations." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (emphasis added); *see also Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) (explaining that "the very assertion of a number of [] claims [of constitutional violations] put the [defendant-c]ity on notice that there was a possibility that its police officers had" violated the Constitution, "*[w]hether or not the claims had validity*" (emphasis added)).

The Court also concludes that there is sufficient evidence for a jury to determine that the City consistently failed to investigate allegedly improper strip searches. *See Lopes*, 2020 WL 1445729, at \*5. First, during discovery the City failed to produce complete records for the investigations into two out of the eight civilian complaints concerning strip searches from the three years prior to the events at issue here. *See supra* §§ I.A.7, II.B.6.a. Based on this gap in the record, a reasonable jury could conclude that there were no investigations conducted *at all* based on those underlying complaints. Second, the record reflects multiple instances where Fegan—the supervising officer during the relevant time period who ostensibly approved requests for strip searches from subordinate officers, (Loomba Decl. Ex. V at 3; Donnell Decl. Ex. 53 at 2)—investigated allegations of unlawful strip searches by his subordinate officers, (Donnell Decl. Ex. 21 at 46:20–25; PSOAF ¶ 43; *see also generally* Donnell Decl. Exs. 27, 31–32, 35).[31] Here again, a jury could reasonably find that Fegan—as both the approving supervisor and investigating officer—was biased and had a conflict of interest in conducting these investigations, such that their conclusions are unreliable, or the process was otherwise tainted because, for example, he had an incentivize to conduct cursory investigations. And finally, with respect to discipline, there is evidence in the record that in at least two instances, violations of the Policy occurred but the offending officers were not disciplined in any meaningful way. *See supra* § I.A.7.

In sum, Plaintiff has adduced sufficient evidence to raise a question of fact as to whether the City faces liability under *Monell* on a failure-to-supervise theory. *See Okin*, 577 F.3d at 440

---

[31] It is also worth noting in this connection that Plaintiff's expert has opined that the failure to assign any complaints concerning strip searches to Internal Affairs instead of a supervising officer like Fegan was a "far departure from [] accepted standards and procedures." (Miller Report at 21.)

("Deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." (alteration and citation omitted)); *cf. Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 732 (N.D.N.Y. 2020) (granting summary judgment to defendants where undisputed record revealed that *all relevant complaints* were investigated and that, as a result of those investigations, supervisors had imposed additional training or disciplined individual officers); *Outlaw v. City of Hartford*, No. 07-CV-1769, 2015 WL 1538230, at *10 (D. Conn. Apr. 6, 2015) (holding summary judgment for defendants was appropriate where *all* of "the complaints against [the defendants were] investigated and resolved, though some of the investigations were slow to be completed"), *on reconsideration in part*, 2015 WL 13646918 (D. Conn. May 5, 2015), *and aff'd*, 884 F.3d 351 (2d Cir. 2018); *see also Thomas v. Roach*, 165 F.3d 137, 145–46 (2d Cir. 1999) (affirming grant of summary judgment where the record revealed, with respect to *all* complaints cited by the plaintiff, that the municipal defendant had investigated and made findings concerning liability for conduct of officers who had been the subject of those complaints).[32]

### d.  Widespread Practice

Defendants argue that Plaintiff has failed to adduce sufficient evidence of the MVPD engaging in a widespread practice of unconstitutional strip searches that would have put the City on constructive notice that such searches were customary.  (Defs' Mem. 26–28.)  The Court disagrees.

---

[32] Contrary to the assumption implicit in Defendants' analysis, Plaintiff's failure to train and failure to supervise claims are not coextensive and, thus, do not rise or fall together.  (Defs' Mem. 28–30; Defs' Reply 18–20).  *See, e.g.*, *Amnesty Am.*, 361 F.3d at 127 n.8 ("While a failure to supervise claim requires allegations as to the violation itself and policymakers' reaction to it, a failure to train claim also requires evidence as to the city's training program and the way in which that program contributed to the violation.").

"In order to establish *Monell* liability based upon a 'persistent and widespread' practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'"  *Lucente v. County of Suffolk*, 980 F.3d 284, 297–98 (2d Cir. 2020) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) ("[A] plaintiff must prove that the custom at issue is permanent and well-settled." (citing *Praprotnik*, 485 U.S. at 127)).  "[A] custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government]."  *Bowen v. County of Westchester*, 706 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (second alteration in original) (quoting *Newton*, 566 F. Supp. 2d at 271 (S.D.N.Y. 2008)); *see also Tuttle*, 471 U.S. at 823–24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").

<u>i.  Background Constitutional Principles on Strip Searches</u>

As a threshold matter, the Court notes that there are widely recognized distinctions between types of strip searches, which the Second Circuit has explained as follows:

> (1) a 'strip search' occurs when a suspect is required to remove his clothes; (2) a 'visual body cavity search' is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a 'manual body cavity search' occurs when the police put anything into a suspect's body cavity, or take anything out.

*Sloley v. VanBramer*, 945 F.3d 30, 36–37 (2d Cir. 2019) (quoting *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013)).

To conduct a strip search of a misdemeanor arrestee, an officer must have a reasonable suspicion that the arrestee is in possession of contraband or a weapon.  *See Hartline v. Gallo*, 546

F.3d 95, 100 (2d Cir. 2008) ("The Fourth Amendment requires an individualized reasonable suspicion that [an] arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest before []he may be lawfully subjected to a strip search." (quotation marks omitted)); *Howard v. Schoberle*, 907 F. Supp. 671, 680 (S.D.N.Y. 1995) ("While strip searches have been upheld as reasonable, the obvious intrusiveness of such a search must be justified by some particularized suspicion that the person searched has committed a crime and may possess weapons or contraband." (citation omitted)); *cf. Bolden v. Village of Monticello*, 344 F. Supp. 2d 407, 417 (S.D.N.Y. 2004) (explaining that "the Second Circuit has exhibited considerable regard for the right of any person—even a person who has been lawfully arrested and confined in a correctional facility pending trial—not to be subjected to a strip search unless there exists particularized suspicion that an individual is secreting contraband").[33]

 While the Second Circuit has not clarified whether the reasonable suspicion standard applies to strip searches of felony arrestees, the standard does apply to a visual body cavity search of *any* arrestee, *Sloley*, 945 F.3d at 38–39.  District courts within the Second Circuit have consistently held that a reasonable suspicion is required to perform a strip search of a felony

---

 [33] The Court notes that, although the Supreme Court has held that a blanket policy of conducting visual body cavity searches on new inmates in a carceral context was constitutional, even for misdemeanor arrestees where there is *no* reason to suspect that the arrestee would have contraband, *see Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318 (2012), the Second Circuit recently made clear that "[a]bsent an actual penological justification or institutional policy [in a jail or prison], [its] prior case law on the constitutional boundaries of permissible strip searches continues to apply," *Murphy v. Hughson*, — F.4th —, 2023 WL 6151382, at *6 (2d Cir. Sept. 21, 2023).

 Moreover, as in *Sloley*, "[t]here is no indication here that the [strip] search[es] [at issue] w[ere] conducted pursuant to a jailhouse policy that would bring [them] within the ambit of [*Florence*]."  945 F.3d at 37 n.5.  Instead, this case concerns alleged searches *incident to arrest*. *See id.*

arrestee.  *See, e.g.*, *Taylor*, 2022 WL 744037, at *17 (applying reasonable suspicion standard to strip search of felony arrestee); *Cannon v. Port Auth. of N.Y. & N.J.*, No. 15-CV-4579, 2020 WL 6290665, at *4 (S.D.N.Y. Oct. 27, 2020) (same); *Tyus v. Newton*, No. 13-CV-1486, 2016 WL 6090719, at *15 (D. Conn. Oct. 18, 2016) (same); *Jackson v. Waterbury Police Dep't*, No. 11-CV-642, 2015 WL 5251533, at *9 (D. Conn. Sept. 8, 2015) (same); *Sims v. Farrelly*, No 10-CV-4765, 2013 WL 3972460, at *8 (S.D.N.Y. Aug. 2, 2013) (same); *Sorrell v. Incorporated Village of Lynbrook*, No. 10-CV-49, 2012 WL 1999642, at *6 (E.D.N.Y. June 4, 2012) (same); *Harriston v. Mead*, No. 05-CV-2058, 2008 WL 4507608, at *3 (E.D.N.Y. Sept. 30, 2008) (same); *see also Murcia v. County of Orange*, 226 F. Supp. 2d 489, 494 (S.D.N.Y. 2002) (same); *Sarnicola v. County of Westchester*, 229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002) (noting that "the Second Circuit has not spoken directly to the appropriate test for the validity of a strip search incident to a felony arrest" but applying reasonable suspicion standard).[34]

Reasonable suspicion requires more than a "mere hunch," but "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause."  *Sloley*, 945 F.3d at 43 (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)).  To decide whether an officer had reasonable suspicion that would warrant a strip or visual body cavity search, courts "look at the totality of the circumstances."  *Id.* at 43 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)); *see also Bobbit v. Marzan*, No. 16-CV-2042, 2020 WL 5633000, at *11 (S.D.N.Y. Sept. 21, 2020) ("Reasonable suspicion must be assessed 'in light of the totality of the circumstances

---

[34] State appellate courts within the Second Circuit have also reached the same conclusion. *See, e.g.*, *People v. Hall*, 886 N.E.2d 162, 168 (N.Y. 2008) (holding reasonable suspicion standard applied to strip searches of all arrestees); *State v. Jenkins*, 842 A.2d 1148, 1156 (Conn. App. Ct. 2004) (adopting "reasonable suspicion" standard for strip searches incident to felony arrest).

known to the officers at the time the search was begun.'" (quoting *United States v. Chirino*, 483 F.3d 141, 148 (2d Cir. 2007))).  An officer must be able to "point to specific objective facts and rational inferences that [he] [is] entitled to draw from those facts in light of [his] experience." *Bobbit*, 2020 WL 5633000, at *9 (quoting *Hartline*, 546 F.3d at 100).  The Second Circuit has emphasized that the reasonable suspicion standard requires an *individualized* inquiry, that is, "[t]he standard requires individualized suspicion, specifically directed to the person who is targeted for the strip [or visual body cavity] search." *Hartline*, 546 F.3d at 100 (citation omitted).  As relevant here, courts in the Second Circuit have repeatedly recognized that "being arrested for a narcotics offense does not *automatically* give rise to a reasonable suspicion to justify a strip search and visual cavity inspection." *Quiles v. City of New York*, No. 15-CV-1055, 2016 WL 6084078, at *11 (S.D.N.Y. Oct. 12, 2016) (emphasis in original); *see also Nelson v. City of New York*, No. 18-CV-4636, 2019 WL 3779420, at *8 (S.D.N.Y. Aug. 9, 2019) (stating same rule); *Monroe v. Gould*, 372 F. Supp. 3d 197, 204 (S.D.N.Y. 2019) (same); *Cordero v. City of New York*, 282 F. Supp. 3d 549, 562 (E.D.N.Y. 2017) (same); *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 292 (S.D.N.Y. 2015) (same); *Ellsworth v. Wachtel*, No. 11-CV-381, 2013 WL 140342, at *5–7 (N.D.N.Y. Jan. 11, 2013) (same); *Sims*, 2013 WL 3972460, at *8 (same); *Sarnicola*, 229 F. Supp. 2d at 273–74 (same, and noting that "[a]n automatic justification for strip searches based on an arrest for a drug-related crime would be inconsistent with the legal concept of reasonable suspicion based on the totality of the circumstances").

In *Sims v. Farrelly*, for example, the plaintiff was arrested at the scene of a drug bust, taken to the police station, and subjected to a visual body cavity search.  *See* 2013 WL 3972460, at *2–3.  The alleged basis for this search was "the narcotics nature of the incident, the easy concealability . . . of crack cocaine, and the criminal history of many of the subjects."  *Id.* at *8

(quotation marks omitted).  Denying the defendant's motion for summary judgment on the plaintiff's unreasonable search claim, the court concluded that this "general[ ]" rationale was insufficient to sustain an "individualized reasonable suspicion . . . that [the] [p]laintiff was secreting narcotics on his person."  *Id.*  Similarly, in *Sarnicola v. County of Westchester*, the defendant officer had "ordered a strip search [of the plaintiff] simply and solely because [the plaintiff] was arrested for suspected involvement in a drug-related felony."  229 F. Supp. 2d at 274.  Granting the plaintiff's motion for summary judgment on her unreasonable search claim, the court concluded that because the defendant "had no particularized reason to suspect that [the plaintiff] was secreting drugs on her person[,]" his search failed to "pass constitutional muster."  *Id.*

The law is also clear that "[m]ere possession of a search warrant . . . will not normally authorize strip searches of the occupants of the premises."  *Rivera*, 928 F.2d at 606; *see also Green*, 96 F. Supp. 3d at 292 ("[I]t is clear that the existence of a warrant authorizing the search of a person or persons, without more, does not justify the extraordinary invasion of privacy caused by a strip search, let alone a visual or invasive body cavity search." (quoting *Bolden*, 344 F. Supp. 2d at 417)); *cf. Chaney v. Vena*, No. 15-CV-653, 2018 WL 4290455, at *5 (N.D.N.Y. May 21, 2018) ("The search warrant authorized a search of 'any person' present, but a body cavity search goes beyond the search of one's 'person.'  Thus, defendants have not shown that if the search did occur, it was justified."), *report and recommendation adopted*, 2018 WL 4288621 (N.D.N.Y. Sept. 7, 2018).

<u>ii.  Application</u>

Plaintiff asserts that there are several pieces of evidence which demonstrate that there was a widespread practice of unconstitutional strip searches by the MVPD, as both Puff and Fegan testified that it was standard practice to strip search individuals where the search warrant

authorized both searches of the premises and of the individuals located therein. (Pl's Opp'n 11.)[35]  Plaintiff also points out that the City received eight complaints in the three years prior to the alleged unconstitutional search of Plaintiff and that five lawsuits were filed alleging unconstitutional strip searches were filed during the twenty years prior to the alleged unlawful search. (Pl's Opp'n 10–11.)

Defendants argue that Plaintiff's evidence is insufficient as a matter of law because although the City was aware of the complaints and lawsuits, it is undisputed that none of them resulted in a finding of liability for an unconstitutional search against any of the officers involved, including the Officer Defendants. (Defs' Reply 17–18.) Defendants also argue that Plaintiff misconstrues Puff and Fegan's testimony as to the practices of the Narcotics Unit. (*Id.* at 18.)

In light of the evidentiary record, the Court concludes that summary judgment on the widespread practice theory of Plaintiff's *Monell* claim is inappropriate in this case. To begin, Puff, who was a member of the Narcotics Unit from 2015 to 2021, testified that the Unit's standard procedure was to strip search a person or persons named in a search warrant at the premises being searched and then transport them back to the station because it was more efficient and potential evidence would not be lost. (Donnell Decl. Ex. 14 at 72:3–73:13.) Puff clearly indicated that the decision to initiate a strip search was based on whether the individual to be searched was referenced in the warrant: "Q[.] . . . [A]ny time you had a warrant to search a

---

[35] Similarly, Plaintiff argues that an investigation opened by DOJ and a public letter sent to the MVPD by the Westchester County District Attorney should serve as evidence of a widespread pattern of unconstitutional searches. (Pl's Opp'n 11.) However, it is undisputed that these investigations were not made public until 2021, so they could not have put the City on notice of a widespread practice at the time that the alleged unconstitutional searches occurred in 2017. *See supra* § I.A.8.

premises and the individuals present in that premises, then you would . . . typically conduct a strip search of the individual[s] named in the warrant?  A[.] Usually, yes."  (*Id.* at 72:14–18.) Puff also specifically testified that he was never provided with an explanation as to why the Narcotics Unit conducted strip searches at the premises being searched: "I don't remember anyone specifically saying [this was the way the Narcotics Unit did strip searches], but that's just the way it was always done."  (*Id.* at 73:12–13.)  Similarly, Fegan, who was the supervising officer of the Narcotics Unit from 2013 to 2020, testified that "[strip searches] have been done at homes where there is a search warrant present that gives us the permission to search the people that are present on the premise[s] the search warrants [were] for."  (Donnell Decl. Ex. 21 at 46:20–25, 54:15–20.)

The testimony of both officers—one of whom was a supervisor of the Narcotics Unit for almost a decade—directly contradicts longstanding and clear Second Circuit precedent that a search warrant—even where it authorizes the search of a person—does not, by itself, authorize a *strip search* of that person.  *See Rivera*, 928 F.2d at 606; *Bolden*, 344 F. Supp. 2d at 419 ("[T]he issuance of a warrant authorizing a search of the premises and persons located therein does not automatically authorize the officers executing the warrant to perform strip . . . searches[.]").  Additionally, even taking Puff's statement to be limited to instances where the person named in the search warrant was being arrested for a drug-related offense and transported to MVPD headquarters, which his deposition testimony could be read to imply, it is also settled law that an arrest for a drug-related offense, without more, is insufficient to provide a reasonable suspicion for a strip search.  *See, e.g.*, *Quiles*, 2016 WL 6084078, at *11; *Sims*, 2013 WL 3972460, at *8; *Sarnicola*, 229 F. Supp. 2d at 274–75.

Defendants argue that Fegan did not testify that strip searches were done automatically or as a matter of course where the warrant authorized a search.  (Defs' Reply 18.)  Although Defendants are correct that Fegan did not testify that a strip search of an individual happened whenever a warrant authorized a search of that person, Puff, who was Fegan's subordinate, *did* testify that it was standard practice to do so, and Fegan's testimony does not conflict with Puff's.  Moreover, it is highly relevant that Fegan gave this testimony even though he was the supervisor of the Narcotics Unit and had been charged by City policy with approving requests for strip searches from subordinate officers.  (Loomba Decl. Ex. V at 3; Donnell Decl. Ex. 53 at 2.)  Fegan did not qualify his statement to indicate that other indicia of reasonable suspicion would be required to conduct a search, even though Second Circuit precedent and the City's Policy specifically and explicitly required those indicia to be present.  (Defs' 56.1 ¶ 54–56; Pl's Resp. 56.1 ¶ 54–56.)

Fegan's testimony is also relevant because, as noted above, City policy placed him in charge of reviewing civilian complaints received concerning the actions of his subordinates.  (PSOAF ¶ 41.)  As relevant here, Fegan completed the initial investigation of at least four civilian complaints in the three years leading up to the alleged unlawful search of Plaintiff.  (*See generally* Donnell Decl. Exs. 27, 31–32, 35.)  As Defendants note, a review of those investigation records demonstrates that Fegan did, in some cases, review his subordinates' actions, and that he concluded in three cases that the strip searches at issue complied with City policy and the Constitution.  (*See* Defs' Mem. 27–28; Defs' Reply 17; Donnell Decl. Ex. 31 at 10–11; Ex. 32 at 54–55; Ex. 35 at 9–10.)[36]  However, this at most raises a question of fact for a

---

[36] It bears noting that evidence in the record suggests that Fegan's investigations were not always completed adequately.  For instance, one complainant, M.H., was arrested based on a previous incident of domestic violence and was charged with Criminal Contempt in the First

jury to resolve; given (1) Puff and Fegan's troubling deposition testimony suggesting that, as a

rule, MVPD Narcotics Unit officers conducted strip searches in a constitutionally impermissible

manner, (2) Fegan's arguably conflicted status as both the approving supervisor for strip searches

and the officer charged with investigating civilian complaints regarding the same, and (3) the

numerous complaints and lawsuits concerning alleged unconstitutional strip searches of which

the City was no doubt aware, a reasonable jury could conclude that any investigation findings

simply are not credible.[37]   In other words, there is a genuine dispute here as to whether there is a

widespread practice of unconstitutional strip searches of which the City must have been aware.

Defendants seeks to make much out of this Court's prior decision—rendered at the

motion to dismiss stage—in *Roman v. City of Mount Vernon*, No. 21-CV-2214, 2022 WL

2819459 (S.D.N.Y. July 19, 2022), where the Court held that the plaintiff's reliance on, inter

---

Degree.  (Donnell Decl. Ex. 27 at 6, 9.)  At MVPD headquarters, the arresting officers strip searched M.H. and recovered drugs from between his buttocks.  (*Id.* at 6–7.)  The officers who completed the strip search did *not* request supervisor approval.  (*Id*.)  The report provided to Fegan by one of the arresting officers also did *not* include any facts demonstrating that there was reasonable suspicion to strip search M.H.  (*Id.* at 8–10, 28.)  In his initial report, Fegan did *not* indicate that the officers had failed to seek supervisor approval or note that they had failed to articulate a basis for a reasonable suspicion to search M.H.  (*Id.* at 6–7.)
      When Fegan's supervisor later interviewed the officer who conducted the strip search, the officer stated that requesting a supervisor's approval was "the last thing on [his] mind[.]'"  (*Id.* at 4.)  The report from Fegan's supervisor notes that the officer who conducted the strip search failed to follow City policy and indicates that the supervisor merely "verbally counseled" the arresting officers and then circulated an email "directing all Division members to review the Department Manual as it pertains to searches of arrestees."  (*Id.* at 5.)

[37] Although the lawsuits and civilian complaints relating to alleged unconstitutional strip searches have not yielded any noteworthy findings of liability to date, their existence is probative to the extent they provide notice to the City regarding its officers' strip-searching practices.  *See Calderon*, 138 F. Supp. 3d at 612 (noting that courts "have held that prior complaints are relevant [to the municipal liability analysis] insofar as they may put a municipality on notice of possible or actual constitutional violations").  (*See also* Miller Dep. at 57:6–19 (opining that the number of strip search complaints against the MVPD Narcotics Unit is "extremely high . . . based on what [Plaintiff's expert] saw in [his multi-decade] career").)

alia, civilian complaints and the same lawsuits Plaintiff references here failed to state claim on the widespread practice issue.  (Defs' Mem. 27–28.)  *See Roman*, 2022 WL 2819459, at \*19–22.  However, this facile argument merits little discussion; the complaint in *Roman* relied upon bare allegations that lawsuits, complaints, and incomplete government inquiries alone were sufficient to establish widespread practice, but here, with the benefit of discovery, Plaintiff has put forth significant, additional evidence to establish widespread practice.  *Compare Roman*, 2022 WL 2819459, at \*19–22, *with* (Donnell Decl. Ex. 14 at 72:3–73:13 (Puff testimony); *id.* Ex. 21 at 54:15–20 (Fegan testimony); *id.* Exs. 27, 31–32, 35 (files relating to civilian strip search complaints)).

Simply put, the aforementioned evidence plainly is sufficient to raise triable issues of fact as to whether the City is liable under *Monell* based on the Narcotics Unit's alleged widespread pattern or practice of conducting unconstitutional strip searches.

### 7.  Intentional Infliction of Emotional Distress

Defendants have also moved for summary judgment on Plaintiff's claim of intentional infliction of emotional distress resulting from Antonini's public strip search of him in the unmarked car.  (Defs' Mem. 30–32; Defs' Reply 12–13.)  Defendants argue that Plaintiff has failed to demonstrate he experienced severe emotional distress and that his claim is barred because the conduct at issue falls within the ambit of a traditional tort, assault.  (Defs' Mem. 30–32; Defs' Reply 12–13.)  Additionally, Defendant argues that Plaintiff cannot raise a claim against the City because it is barred by public policy.  (Defs' Mem, 30–32.)

In New York, the elements of a claim for intentional infliction of emotional distress ("IIED") are: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co.*, 612 N.E.2d

699, 702 (N.Y. 1993).  "New York courts have imposed a very high threshold for intentional

infliction of emotional distress claims, requiring that the conduct must be so outrageous and

extreme as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community." *Druschke v. Banana Republic, Inc.*, 359 F. Supp.

2d 308, 314 (S.D.N.Y. 2005) (citation omitted).

As a threshold matter, Plaintiff appears to agree with Defendants that New York law bars

IIED claims against government entities, so summary judgment on this claim is granted for the

City.  (Pl's Opp'n 33.)  *See also Lauer v. City of New York*, 659 N.Y.S.2d 57, 58 (App. Div.

1997) ("It is well settled that public policy bars claims sounding in intentional infliction of

emotional distress against a governmental entity." (collecting cases)); *Noel Pane v. Town of

Greenburgh*, No. 07-CV-3216, 2012 WL 12886971, at *6 (S.D.N.Y. Mar. 21, 2012) (same).

As to the Officer Defendants, Defendants have argued that Plaintiff has failed to allege

sufficient evidence of "severe emotional distress," because he has testified in his deposition that

he did not seek counseling or psychological treatment and has adduced no other evidence to

support his claim.  (Defs' Mem. 31.)  Plaintiff counters that the record supports his claim

because, drawing all inferences and resolving all factual disputes in his favor, Antonini strip

searched him in public while both men were in the unmarked car.  (Pl's Opp'n 32.)  Plaintiff

asserts that a public strip search is per se extreme and outrageous conduct and thus serves as

evidence of his extreme emotional distress.  (*Id.* at 33.)

The Court agrees with Plaintiff.  Courts in this District have consistently held that an

unlawful public strip search and use of excessive force are sufficiently extreme and outrageous

conduct so as to allow an IIED claim to survive summary judgment, even in the absence of

medical evidence of a plaintiff's severe emotional distress.  *See, e.g., Jean–Laurent v. Hennessy*,

No. 05-CV-1155, 2008 WL 3049875, at *4, 20 (E.D.N.Y. Aug. 1, 2008) (denying summary judgment where there was evidence that the plaintiff "was slammed against his car while handcuffed and publicly strip searched with no justification," even though record reflected that plaintiff had not sought psychological treatment); *Travis v. Village of Dobbs Ferry*, 355 F. Supp. 2d 740, 756 (S.D.N.Y. 2005) (denying summary judgment on IIED claim based on false arrest and strip search without reference to plaintiff providing evidence of severe emotional distress); *Mejia v. City of New York*, 119 F. Supp. 2d 232, 286 (E.D.N.Y. 2000) (denying summary judgment on IIED claim where questions of fact remained regarding whether strip search was justified without reference to any evidence adduced by plaintiff as to severity of emotional distress).[38]

### 8.  Respondeat Superior

Defendants have argued that because they must be granted summary judgment on Plaintiff's IIED claim, he has no viable state claim on which to base a claim for respondeat superior liability on the part of the City.  (Defs' Mem. 32.)  However, because Plaintiff's IIED claim survives as against the Officer Defendants, whether the City may be liable on a respondeat

---

[38] The cases Defendants cite in support of their position are not to the contrary.  (Defs' Mem. 31–32; Defs' Reply 13.)  *See Johnson v. Maurer*, No. 18-CV-694, 2018 WL 6421059, at *18 (D. Conn. Dec. 6, 2018) (granting motion to dismiss IIED claim where incarcerated plaintiff asserted his distress arose from defendants' inaction); *Walentas v. Johnes*, 683 N.Y.S.2d 56, 57–58 (App. Div. 1999) (affirming dismissal of IIED claim because defendant's commencement of litigation, even if for purposes of harassing plaintiff, was not extreme and outrageous conduct).

Defendants have also argued that Plaintiff may not raise an IIED claim because it is duplicative of a traditional tort claim for assault.  (Defs' Reply 13.). However, the case Defendants cite, *Afifi v. City of New York*, does not support this position because, in relevant part, it dealt with a claim for negligent infliction of emotional distress, not IIED.  961 N.Y.S.2d 269, 270 (App. Div. 2013).  Moreover, even if *Afifi* had addressed IIED in this context, the court there was clear that the question was whether the plaintiff had raised the duplicative cause of action in the suit, not whether the plaintiff could have raised the claim at all.  *Id*.  ("[T]he allegations of negligent infliction of emotional distress were duplicative of *the viable portions of the subject causes of action*[.]" (emphasis added)).  Here, it is undisputed that Plaintiff has not alleged a cause of action sounding in assault.  (*See generally* FAC.)

superior basis is a question that must be resolved at trial.  *See Rhooms v. City of New York*, No. 11-CV-5910, 2017 WL 1214430, at *12 (E.D.N.Y. Mar. 31, 2017) (denying summary judgment on respondeat superior theory of liability where underlying state claims on which such liability would be predicated had survived summary judgment).

### III.  Conclusion

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment is granted in part and denied in part.  Defendants' Motion is granted on the invalid search warrant claim as to all Defendants except for Puff and on the false arrest claim as to all Defendants.  Defendants' Motion is also granted as to Plaintiff's state and federal malicious prosecution claims.  As to Plaintiff's *Monell* claim against the City, Defendant's Motion is granted with respect to Plaintiff's failure to train theory but otherwise denied.  Accordingly, Plaintiff will be able to present his failure to supervise and widespread practice theories of *Monell* liability at trial..

As to the Officer Defendants, summary judgment is denied on Plaintiff's IIED claim arising from Antonini's alleged public strip search of Plaintiff in the unmarked car; summary judgment on Plaintiff's IIED claim is granted with respect to the City.  However, because the IIED claim survives summary judgment, Plaintiff may argue at trial that the City should be liable under a theory of respondeat superior.  Defendants' Motion is also denied on the failure to intervene claims as to all Officer Defendants.  Specifically, summary judgment is denied as to Defendants Puff, Quinoy, and Fegan for the failure to intervene with regard to Antonini's alleged strip search of Plaintiff in the unmarked car outside of the Bungalow Bar; summary judgment is granted to the other Officer Defendants.  Summary judgment is denied as to Defendants Valente, Palmer, Puff, and Fegan as to Antonini's alleged strip search of Plaintiff in Apartment 4N's bathroom; summary judgment is granted to Quinoy as to that alleged strip search.

The Court will hold a status conference on November 16, 2023, at 10:30 AM.  The Clerk of Court is respectfully directed to terminate the pending Motion.  (*See* Dkt. No. 122.)

SO ORDERED.

Dated:    September 29, 2023
          White Plains, New York

_____
          KENNETH M. KARAS
          United States District Judge